BENJAMIN L. COLEMAN
BENJAMIN L. COLEMAN LAW PC
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone No. (619) 865-5106
Email: blc@blcolemanlaw.com

MICHAEL F. PHILLIPS
PHILLIPS & BORDALLO
410 West O'Brien Drive
Hagatna, GU 96910-5044
Telephone No. (949) 481-4900
Facsimile No. (671) 477-2223
Email: advice@phillipsbordallo.law

*Counsel for Defendant Mark S. Smith*

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 17-00020 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MOTION FOR JUDGMENTS |
| | ) | OF ACQUITTAL, NEW TRIAL, |
| MARK S. SMITH, | ) | AND TO ARREST JUDGMENT |
| Defendant. | ) | |
| | ) | |

COMES NOW, defendant Mark S. Smith, by and through undersigned counsel, and moves this Honorable Court for an Order granting judgments of acquittal, a new trial, and arrest of judgment on all counts. *See* Fed. R. Crim. P. 29, 33, 34.

Respectfully submitted,

*s/Benjamin L. Coleman, s/Michael F. Phillips*

Dated: April 12, 2022          BENJAMIN L. COLEMAN
                               MICHAEL F. PHILLIPS

                               *Counsel for Defendant Mark S. Smith*

# **TABLE OF CONTENTS**

Table of authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  The Court should grant acquittals on all counts because the government's theory
of property fraud was defective; or, the Court should grant a new trial because the
prosecutor improperly argued an uncharged honest services theory in summations. . . . . . 2

      A.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.  The Court should grant judgments of acquittal on all counts. . . . . . . . . . 2
      C.  Alternatively, the Court should grant a new trial because the
      prosecutor argued an uncharged honest services fraud theory in
      summations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.  The Court should order a new trial on all counts because the defective property
fraud theory based on the HAP payments tainted the jury's general verdict, and the
prosecutor constructively amended the indictment in his closing argument.  . . . . . . . . . . 9

III.  The jury instructions on the requisite intent and an omissions theory of fraud
were flawed in multiple respects, and the instructions were erroneously one-sided
and "marshaled" the evidence in favor of the government. . . . . . . . . . . . . . . . . . . . . . . . 11

      A.  Instructions Nos. 19 and 20 were flawed. . . . . . . . . . . . . . . . . . . . . . . . 11
      B.  Instruction No. 29 further undermined the mens rea element. . . . . 15
      C.  The instructions on omissions and duty to disclose were erroneous. . . . 18
      D.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IV.  The Court should grant a judgment of acquittal and dismiss Count 28.. . . . . . . . . . 20

      A.  Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      B.  The § 641 charge in Count 28 was outside the limitations period. . . . . . 20
      C.  There was insufficient evidence of money
      "of the United States" for § 641. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Allison Engine Co. v. United States ex rel. Sanders*,
    553 U.S. 662 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Burrage v. United States*,
    571 U.S. 204 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cleveland v. United States*,
    531 U.S. 12 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,8

*Custis v. United States*,
    511 U.S. 485 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Deck v. Jenkins*,
    814 F.3d 954 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Kelly v. United States*,
    140 S. Ct. 1565 (2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,4,5,7,8

*McCormick v. United States*,
    500 U.S. 257 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*McDonnell v. United States*,
    136 S. Ct. 2355 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*McNally v. United States*,
    483 U.S. 350 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Morissette v. United States*,
    342 U.S. 246 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Physicians for Social Responsibility v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Quercia v. United States*,
    289 U.S. 466 (1933). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rehaif v. United States*,
    139 S. Ct. 2191 (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13

*Skilling v. United States*,
    561 U.S. 358 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,14

*Smith v. Curry*,
    580 F.3d 1071 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Starr v. United States*,
    153 U.S. 614 (1894). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Stirone v. United States*,
    361 U.S. 212 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Tanner v. United States*,
    483 U.S. 107 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Toussie v. United States*,
    397 U.S. 112 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Amlani*,
    111 F.3d 705 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Bohonus*,
    628 F.2d 1167 (9th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Bruchhausen*,
    977 F.2d 464 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6

*United States v. Choy*,
    309 F.3d 602 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Davis*,
    854 F.3d 601 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,10

*United States v. Donato-Morales*,
    382 F.3d 42 (1st Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Dowling*,
    739 F.2d 1445 (9th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Dunsmore*,
    446 F.2d 1214 (8th Cir. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17,18

*United States v. Fierros*,
    692 F.2d 1291 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,13

*United States v. Flores*,
    802 F.3d 1028 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Garrido*,
    713 F.3d 985 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 7,8,9,11,20

*United States v. Gaudin*,
    515 U.S. 506 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Green*,
    897 F.3d 443 (2d Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Johnson*,
    596 F.2d 842 (9th Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Levy*,
    578 F.2d 896 (2d Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Lindsey*,
    850 F.3d 1009 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Liu*,
    731 F.3d 982 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,21

*United States v. Moran*,
    493 F.3d 1002 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Mundy*,
    539 F.3d 154 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Munguia*,
    704 F.3d 596 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Preston*,
    873 F.3d 829 (9th Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Ramirez*,
    714 F.3d 1134 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Rodriguez*,
    880 F.3d 1151 (9th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Rubio-Villareal*,
    967 F.2d 294 (9th Cir. 1992) (*en banc*). . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Sadler*,
    750 F.3d 585 (6th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

*United States v. Shields*,
    844 F.3d 819 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Sine*,
    493 F.3d 1021 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Smith-Baltiher*,
    424 F.3d 913 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,15

*United States v. Velazquez*,
    1 F.4th 1132 (9th Cir. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Warren*,
    25 F.3d 890 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. White Eagle*,
    721 F.3d 1108 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Wolf*,
    820 F.2d 1499 (9th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Yashar*,
    166 F.3d 873 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,21

*United States v. Yates*,
    16 F.4th 256 (9th Cir. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,5,7,9,10,11

## STATUTES

18 U.S.C. § 641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 666 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,23

18 U.S.C. § 1341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 1349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 U.S.C. § 3282 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## MISCELLANEOUS

24 C.F.R. § 982.161 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,13,18

Ninth Circuit Model Instruction No. 15.35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# INTRODUCTION

Throughout these proceedings, one of the prosecutor's refrains has been, "this is not a criminal conflict of interest case." Tr. 3265 (Dec. 3, 2021); *see* Tr. 5 (Nov. 2, 2021).[1] While somewhat misleading given the centrality of the conflict of interest question in this prosecution, the bigger problem with the prosecutor's point is that it begs the question: What type of criminal case is it? More specifically, is this a property fraud case, or is it an honest services fraud case?

The answer is that the government charged *property* fraud under 18 U.S.C. § 1343, *not* honest services fraud under 18 U.S.C. § 1346. But, to use another one of the prosecutor's tag-lines, the government has improperly tried to "double-dip." Tr. 7 (Nov. 12, 2021). Indeed, it has dipped back and forth between the different theories of fraud (and still other theories not charged in the indictment) depending on which parts of each distinct theory would make it more convenient to secure convictions against Mr. Smith, although this approach of mashing the offenses together into a hybrid "property/honest services" fraud offense is legally invalid. Consistent with a recent Ninth Circuit opinion reversing fraud convictions, this Court should recognize that "[a]s the government presented the case, it was effectively an honest-services case dressed in the garb of" a defective theory of property fraud. *United States v. Yates*, 16 F.4th 256, 268 (9ᵗʰ Cir. 2021).

The government's charging strategy (and really over-charging strategy) was flawed from the start, and the tactical decision to mis-charge this case as property fraud and derivative money laundering is not the only reason why the jury's verdicts cannot stand. The government also improperly argued uncharged and erroneous theories to the jury while convincing the Court to give defective jury instructions contrary to long-established case law. As discussed in more detail below, the end result of the government's tactics is that acquittals or at least a new trial should be granted on all counts.

---

[1] "Tr." refers to Transcript and is followed by the specific date of the proceeding. "Doc." refers to the docket entry.

# ARGUMENT

**I. The Court should grant acquittals on all counts because the government's theory of property fraud was defective; or, the Court should grant a new trial because the prosecutor improperly argued an uncharged honest services theory in summations.**

## A. Introduction

Because the prosecution of Mr. Smith has gotten to this point through a great deal of obfuscation, the lead issue in this motion seeks to distill the case to a few basic, clear, and controlling legal principles. While the government's evidence had significant holes, the initial Rule 29 claim presented below is meritorious even assuming all of the facts alleged by the government. In other words, the Court can assume that Mr. Smith was a "covered individual" required to disclose a financial interest to obtain HAP payments and failed to do so. The Court can assume that not only did he fail to disclose the interest, but he actively hid the interest through a series of secret transactions and false statements. The Court can further assume that GHURA and HUD would not have issued the HAP payments had they known the hidden and misrepresented facts. And, the Court can assume that those governmental entities have an interest in maintaining their "integrity" and avoiding any appearances of impartiality in the Section 8 program.

The bottom line is that even assuming all of this, the government still did not prove *property* fraud, as the scheme did not deprive the entities of property by cheating them monetarily. The governmental entities paid a fair price for properties rented by deserving Section 8 tenants, and the government did not charge honest services fraud, thereby making interests in "integrity" or impartiality legally irrelevant. Accordingly, the Court should grant judgments of acquittal on all counts, or at least a new trial due to the prosecutor's efforts to mislead the jury with an uncharged honest services fraud theory.

## B. The Court should grant judgments of acquittal on all counts

The government's theory of the case as to Counts 1-28 is that Mr. Smith committed *property* fraud because he failed to disclose and hid that he had a conflict of interest under 24 C.F.R. § 982.161 and thereby received HAP payments that he would not have received if he had disclosed the conflict. *See* Tr. 3131-37 (Dec. 3, 2021); Tr. 3481-

3487 (Dec. 6, 2021).  The government did not prove or even allege in the indictment that GHURA and HUD did not receive the rental units leased or that the price for the units was unfair; in other words, from a monetary or property perspective, GHURA and HUD received what they paid for.  Instead, the prosecutor summed up the government's theory as follows:  "[W]hat my catchphrase was for the whole case, for the way to think about it was this is about a lawyer who lied so he could keep being a landlord.  It really is that simple."  RT 3620 (Dec. 6, 2021).  It's not that simple.  Under a long line of Supreme Court and Ninth Circuit precedent, being a landlord who provides rental properties at a fair price is not property fraud, despite the alleged lies he may have told.

The Supreme Court rejected the theory of property fraud alleged against Mr. Smith thirty-five years ago in *McNally v. United States*, 483 U.S. 350 (1987), where the government pursued an essentially identical prosecution.  As is the allegation here, the scheme alleged in *McNally* was that local officials hid or failed to disclose that they had a financial interest in a government contract (involving insurance), and had the conflict been disclosed, the contract would not have been awarded.

The Supreme Court reversed the defendants' convictions, holding that such a scheme does not constitute *property* fraud because the government did not show "that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance."  *Id.* at 360.  In other words, while there may have been a hidden and perhaps distasteful conflict of interest that affected how the contract was awarded, the State got what it paid for and therefore was not defrauded of its property rights.  The same is true here; the government did not prove or even allege that GHURA and HUD failed to receive Section 8 rental units at a fair price.  From a property or financial perspective, they got what they paid for.

The Supreme Court recently described *McNally* as limiting the scope of the federal fraud statutes "to the protection of property rights."  *Kelly v. United States*, 140 S. Ct. 1565, 1571 (2020).  Despite the government's theory of the case against Mr. Smith, the statutes do "not authorize federal prosecutors to 'set standards of disclosure and good

1    government for local and state officials.'" *Id.* In short, the government's theory of
2    property fraud in this case is foreclosed by *McNally*, and this Court need go no further.
3    Nevertheless, in case there were any doubt, an avalanche of post-*McNally* authority also
4    refutes the government's theory of property fraud in this case.

5       Responding to *McNally*, Congress enacted 18 U.S.C. § 1346, the honest services
6    fraud statute. *See Kelly*, 140 S. Ct. at 1571. In *Skilling v. United States*, 561 U.S. 358
7    (2010), however, the Supreme Court once again rejected the government's position that
8    federal criminal fraud includes schemes to obtain money by failing to disclose a conflict of
9    interest. Due to constitutional vagueness and other concerns, *Skilling* held that the § 1346
10   offense must be limited to bribery and kickback schemes. *Id.* at 408-09. As part of its
11   holding, the Supreme Court explicitly rejected the government's request to include
12   "nondisclosure of a conflicting financial interest" as a viable theory of fraud. *Id.* at 409-10.

13      With respect to non-disclosure of conflicts of interest, *Skilling* held that the federal
14   fraud statutes "must exclude this amorphous category of cases." *Id.* at 410. Among other
15   things, the Court explained that prohibiting a conflict of interest theory of fraud was
16   appropriate because the fraud statutes also serve as predicates for money laundering,
17   thereby allowing prosecutors to overcharge cases (as was done here). *Id.* at 411. Perhaps
18   more importantly, the Supreme Court noted the precise vagueness problems exemplified by
19   the prosecution of Mr. Smith and rhetorically questioned: "How direct or significant does
20   the conflicting financial interest have to be? To what extent does the official action have to
21   further that interest in order to amount to fraud? To whom should the disclosure be made,
22   and what information should it convey?" *Id.* at 411 n.44.[2] Clarifying the point, the
23   Supreme Court recently described *Skilling* as follows: "We specifically rejected a proposal

24

25      [2]  To the extent that a nondisclosure of a conflict of interest could support a federal
26   property fraud conviction – and it clearly can't – the alleged conflict here, which included
27   even "indirect" "prospective" interests of a non-employee who took no direct official action
     on the subject matter, would not satisfy the constitutional vagueness concerns articulated in
28   *Skilling*. For this additional reason, judgment should be arrested on all counts of conviction.

1  to construe the statute as encompassing 'undisclosed self-dealing by a public official,' even
2  when he hid financial interests.'" *Kelly*, 140 S. Ct. at 1571.

3        The government presumably recognized that, due to *Skilling*, it could not proceed
4  against Mr. Smith on its failure to disclose a conflict of interest theory pursuant to § 1346,
5  the honest services statute.  As a result, it did not charge § 1346 and has instead sought to
6  revert back to § 1343, the property fraud statute, under the theory that was originally
7  rejected in *McNally*.  In recently exposing an identical tactic by the government to do an
8  "end-run" around *Skilling*, the Ninth Circuit explained that the Supreme Court did not
9  intend "to let in through the back door the very prosecution theory that it tossed out the
10 front." *United States v. Yates*, 16 F.4th 256, 267 (9th Cir. 2021) (holding that *McNally*
11 foreclosed the government's property fraud theory).  As the recent opinion in *Kelly*
12 explained, *McNally* is alive and well, and in order to proceed under property fraud, the
13 government had to prove a scheme intended to cause a financial "loss," such as, for
14 example, a scheme where Mr. Smith intended to have the HAP payments used to pay a
15 family member's rent rather than for a deserving Section 8 tenant.  *Kelly*, 140 S. Ct. at
16 1573 (giving an example of a mayor using city resources "to renovate his daughter's new
17 home"); *see Cleveland v. United States*, 531 U.S. 12, 20 (2000) (for property fraud,
18 *McNally* requires a "monetary loss" theory).

19       As reflected in the recent *Yates* opinion, the Ninth Circuit has dutifully followed
20 the Supreme Court's lead, and it has recognized that not every material false statement or
21 omission that causes a victim to part with money or property constitutes property fraud.  A
22 good example is *United States v. Bruchhausen*, 977 F.3d 464 (9th Cir. 1992), where the
23 Ninth Circuit reversed wire fraud convictions of a defendant who had used various
24 deceptive practices, including falsely assuring the victims that all of the equipment he
25 purchased would be used domestically when in truth he was shipping it to Soviet Bloc
26 countries.  The Ninth Circuit held that the defendant did not defraud the victims of a
27 property right, even though they would not have sold the equipment to him if they had
28 known it would be shipped overseas.  *Id.* at 468.

*Bruchhausen* analogized to *McNally* and explained: "In *McNally*, government employees purchasing insurance for the state required the seller to share its commissions with other companies in which the government employees had an interest. There was no showing that the state paid more for its policies than it otherwise would have, or that it received less insurance. . . . The Supreme Court reversed, holding that, under such a theory, no 'property' had been taken by fraud within the meaning of the mail fraud statute, 18 U.S.C. § 1341." *Id.* This was so even though "[i]n *McNally*, it was doubtless true that the state would not have permitted the policies to be purchased if it had known of the arrangement for sharing of commissions." *Id.* Again, the same is true here, as the government did not prove or even allege that GHURA paid unfair or excessive fees for the rentals that were provided to the Section 8 tenants; whether GHURA or HUD would not have entered into the HAP contracts if they had known about the alleged conflict is besides the point.

As they must, other circuits have also followed *McNally* and the Supreme Court's subsequent property fraud precedent. Judge Sutton's opinion for the Sixth Circuit in *United States v. Sadler*, 750 F.3d 585 (6ᵗʰ Cir. 2014) is a good example. *Sadler* reversed a defendant's wire fraud conviction for insufficient evidence even though she repeatedly lied to the pharmaceutical distributors who supplied her with prescription pain pills by falsely claiming, among other things, that the drugs were being used to serve "indigent" patients. *Id.* at 590. "Through it all, however, the government never showed that [the defendant] intended to deprive anyone of property. All that the evidence shows is that [the defendant] paid full price for all the drugs she purchased and did so on time. How, then, did [she] deprive the distributors of property?" *Id.* at 590. The government contended in *Sadler* that the defendant "deprived the distributors of their pills[,]" to which the court responded: "Well, yes, in one sense: The pills were gone after the transaction. But paying the going rate for a product does not square with the conventional understanding of 'deprive.' Stealing the pills would be one thing: paying full price for them is another." *Id.* "Case law reinforces that the conventional meaning of 'deprive' applies in the fraud context. To be

guilty of fraud, an offender's 'purpose must be to injure, a common-law root of the federal fraud statutes." *Id.* (citations omitted). The Sixth Circuit also rejected the government's theory that the distributors would not have sold the pills to the defendant had they known the truth, explaining that such a theory does not constitute property fraud based on *McNally*. *Id.* at 590-91.

In sum, the prosecution of Mr. Smith reflects another effort by the government to try an end-run around *McNally* and *Skilling*, no matter how many times the Supreme Court, the Ninth Circuit, and other courts have rejected such a tactic. "As the government presented the case, it was effectively an honest-services case dressed in the garb of" a defective theory of property fraud. *Yates*, 16 F.4th at 268. Given the defective theory, this Court should grant judgments of acquittal on all counts. The invalid theory cannot support the wire fraud charges under 18 U.S.C. §§ 1343 and 1349 in Counts 1-27, *see Kelly*, 140 S. Ct. at 1571 n.1, nor can it support the 18 U.S.C. § 641 charge in Count 28 as the only theory that the government proceeded on was the same defective property fraud theory. *See Kelly*, 140 S. Ct. at 1568 (also overturning property fraud conviction under 18 U.S.C. § 666); *McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991); *Yates*, 16 F.4th at 265. Furthermore, due to the insufficiency of the evidence as to all of the underlying counts, judgments of acquittal must also be entered on the derivative money laundering counts (Counts 29, 30, 33-34, 38, and 45). *See, e.g.*, *United States v. Garrido*, 713 F.3d 985, 998-99 (9th Cir. 2013).

### C. Alternatively, the Court should grant a new trial because the prosecutor argued an uncharged honest services fraud theory in summations

Even if the Court somehow finds that the government presented sufficient evidence of property fraud, it still should grant a new trial because the government improperly argued an honest services fraud theory during summations. Again, the government made the tactical decision to charge property fraud, not honest services fraud under § 1346. However, when discussing the elements of the offense at a crucial part of the summations, the prosecutor argued:

> They didn't get what they paid for because they got landlord rental services that weren't free of improper influence or an appearance of impropriety. Mike Flores explained why the program integrity matters, right, to encourage the landlords to participate. Mr. Smith and Mr. Wong's conspiracy and scheme cheated GHURA and HUD out of money and undermined the integrity of the Section 8 Program on Guam.

RT 3479 (Dec. 6, 2021).

Thus, the prosecutor made an honest services fraud argument. The problem is that the government did not charge honest services fraud. The Supreme Court recently made clear in *Kelly* that the prosecutor's argument misstates the property fraud offense, as the property fraud statutes do not permit the government "to enforce (its view of) *integrity*" because those statutes "do not 'proscribe schemes to defraud citizens of their intangible rights to honest and impartial government.'" *Kelly*, 140 S. Ct. at 1574 (emphasis added) (quoting *McNally*, 483 U.S. at 3355). "They bar *only* schemes for obtaining property." *Id.* (emphasis added); *see Cleveland*, 531 U.S. at 20-21 (rejecting argument that ensuring "public confidence and trust" is a sufficient interest to sustain a property fraud charge).

The prosecutor misstated the law and urged the jury to convict under a legally invalid and uncharged theory, constituting obvious misconduct. *See United States v. Flores*, 802 F.3d 1028, 1035-36 (9th Cir. 2015). "[I]t was improper to use the [honest services] lingo in this loose manner when suggesting that such an [interest] was sufficient to warrant a conviction for the crime[s] charged. Doing so misstate[d] the law, because [Mr. Smith] was not charged with" honest services fraud. *Id.* at 1036. The prosecutor's misstatement of the law on this crucial issue violated Mr. Smith's due process rights, *see United States v. Velazquez*, 1 F.4th 1132, 1136 (9th Cir. 2021); *Deck v. Jenkins*, 814 F.3d 954, 977-78 (9th Cir. 2016), and arguing an uncharged honest services theory constituted a constructive amendment of the indictment. *See United States v. Davis*, 854 F.3d 601, 603-06 (9th Cir. 2017).

Thus, even if the evidence were somehow sufficient, the Court should grant a new trial on all counts, as this significant error tainted the underlying offenses and also requires a new trial on the derivative money laundering counts. *See Garrido*, 713 F.3d at 998-99.

**II.  The Court should order a new trial on all counts because the defective property fraud theory based on the HAP payments tainted the jury's general verdict, and the prosecutor constructively amended the indictment in his closing argument.**

As discussed above, the government failed to prove property fraud, as GHURA received the rental properties that it paid for at a fair price, and therefore judgments of acquittal should be entered on all counts.  However, even if a legally sufficient theory of property fraud could somehow be cobbled together from the government's presentation, a new trial would nevertheless be required because the jury's general verdict was certainly tainted by the invalid property fraud theory discussed in the preceding section, which permeated the government's theory of the case at trial.  *See Yates*, 16 F.4th at 269; *Garrido*, 713 F.3d at 996-99.[3]

The government may have recognized that its property fraud theory based on the HAP payments was defective, and therefore in one passing comment during summations, the prosecutor argued:  "GHURA and HUD didn't get what they paid for.  They wanted unbiased legal advice." Tr. 3479 (Dec. 6, 2021).  A theory that property fraud was established by the payment of Mr. Smith's legal fees cannot sustain the convictions for numerous reasons.  Again, given the general verdict, there is no way to know whether the jury found this theory, as opposed to the defective HAP-payments theory, and therefore at least a new trial on all counts is required.  *See Yates*, 16 F.4th at 269; *Garrido*, 713 F.3d at 996-98.

Moreover, this alternative theory cannot possibly sustain Counts 2-28 because each of those counts specifically alleged HAP payments, not payments for legal fees.  Doc. 1 (pages 13-15 of the indictment).  Even the conspiracy charge in Count 1 specifically alleged that the conspiracy was to obtain HAP payments, not legal fees, Doc. 1 (paragraphs 20-21 of the indictment), and there was no evidence that the only alleged co-conspirator, Glenn Wong, had an agreement with Mr. Smith regarding the legal fees, which is

---

[3]    The jury returned a general verdict, and the Court overruled the defense's objection that there was no specific unanimity instruction.  Tr. 3253-54 (Dec. 3, 2021).

undoubtedly why such a conspiracy was not charged. Indeed, when responding to the defense's Rule 29 motion during the trial, the government only argued the HAP payments and never mentioned a legal-fees theory. Tr. 3129-41 (Dec. 3, 2021). To the extent that the legal-fees theory has any validity and could possibly sustain the convictions, even though it was not charged, it constitutes a constructive amendment of the indictment or at least a fatal variance that requires a new trial on all counts. *See Stirone v. United States*, 361 U.S. 212, 217-19 (1960); *Davis*, 854 F.3d at 603-06; *United States v. Choy*, 309 F.3d 602, 607-08 (9th Cir. 2002).

In any event, a property fraud theory based on the legal fees is legally insufficient for numerous reasons. As an initial matter, the theory runs into the same *McNally* problem discussed earlier, as it too is based on a theoretical and potential conflict of interest rather than a property right. Moreover, Mr. Smith was providing legal advice to GHURA, not HUD. GHURA knew that Mr. Smith was a Section 8 landlord before it paid him any legal fees. Knowing that Mr. Smith was receiving HAP payments, GHURA elected to proceed with him as its outside counsel, just as it had similarly proceeded for many years with its prior outside counsel, despite a similar potential conflict, demonstrating that GHURA did not consider HAP payments material to its desires with respect to conflict-free legal advice. *See United States v. Lindsey*, 850 F.3d 1009, 1017 (9th Cir. 2017) ("evidence of the Government's past treatment of a particular requirement is admissible to show that a defendant's violation of that requirement is not material"). Similarly, any type of "salary-maintenance" theory based on the legal fees is insufficient to prove property fraud. *Yates*, 16 F.4th at 267.

Furthermore, even if Mr. Smith had a conflict of interest prohibiting him from receiving HAP payments under the CFR, the federal regulations do not dictate whether his legal advice to GHURA was tainted by a conflict, which is governed by Guam law. The government did not prove beyond a reasonable doubt that Mr. Smith's legal advice was conflicted under Guam law. To the extent there was a conflict, it was clearly waiveable, and GHURA waived it and did not believe the advice it was receiving was conflicted or

"biased." Certainly, the government did not prove beyond a reasonable doubt that the officials at GHURA who hired Mr. Smith believed that they did not receive the "unbiased" legal advice that they paid for. Indeed, the evidence that he was even actually paid for performing work on Section 8 matters was scant at best and certainly did not satisfy the lofty reasonable doubt standard.

In sum, the property fraud theory that was actually charged in the indictment and predominated the presentation at trial was the HAP-funds theory, which was legally deficient; thus, at the very least, a new trial is required on all counts. *See Yates*, 16 F.4th at 269; *Garrido*, 713 F.3d at 996-99. A purported legal-fees theory constructively amended the indictment, thereby requiring at least a new trial; in any event, such a theory also cannot support the property fraud offense that was required to sustain the charges.

**III. The jury instructions on the requisite intent and an omissions theory of fraud were flawed in multiple respects, and the instructions were erroneously one-sided and "marshaled" the evidence in favor of the government.**

**A. Instruction Nos. 19 and 20 were flawed**

Instruction No. 19 told the jury: "The government is not required to prove that the defendant knew that his acts or omissions were unlawful." Doc. 557. Furthermore, Instruction No. 20 provided:

> You may find that the defendant acted knowingly if you find beyond a reasonable doubt that the defendant:
>
> 1. was aware of a high probability that *HUD would conclude* he had a conflict of interest, and
>
> 2. deliberately avoided learning the truth.
>
> You may not find such knowledge, however, if you find that the defendant actually believed that *HUD would not conclude* that he had a conflict of interest, or if you find that the defendant was simply negligent, careless, or foolish.

Doc. 557 (emphases added). The combination of these instructions, given over objections, Tr. 3262-73 (Dec. 3, 2021); Tr. 3332-3346 (Dec. 4, 2021), erroneously described the critical mens rea element of the offenses.

Despite this Court's initial (and correct) instinct, Tr. 3331 (Dec. 4, 2021), the government convinced the Court to give Instruction No. 20 based on arguments that were

1  flat-out wrong, such as that wire fraud and § 641 are not specific intent crimes.  Tr. 3333

2  (Dec. 4, 2021).  Indeed, the government submitted a brief that was long on hyperbole,

3  asserting that the law supporting its proposed instruction was "obvious," but short on

4  citations to any relevant authority.  Doc. 552.

5       Starting with the basics, the law has been clear for decades that both wire fraud and

6  § 641 are specific intent crimes.  *See, e.g.*, *United States v. Sine*, 493 F.3d 1021, 1033 (9th

7  Cir. 2007) ("specific intent [is] required for conviction under the [similarly interpreted]

8  mail fraud statute"); *United States v. Bohonus*, 628 F.2d 1167, 1174 and n.12 (9th Cir.

9  1980) ("Mail fraud is a specific intent crime.").  Ironically, one of the landmark Supreme

10 Court opinions on mens rea and specific intent is a § 641 case.  *See Morissette v. United*

11 *States*, 342 U.S. 246 (1952); *United States v. Donato-Morales*, 382 F.3d 42, 47 (1st Cir.

12 2004) (*Morissette* "held that Congress, in codifying the common law crimes described in §

13 641, intended to incorporate the common law requirement of specific intent as an element

14 of the crime"); *United States v. Fierros*, 692 F.2d 1291, 1294 (9th Cir. 1982).

15      Because there is a specific intent element, "good faith belief in legality" provides a

16 defense.  *United States v. Moran*, 493 F.3d 1002, 1012 (9th Cir. 2007) (reversing mail and

17 wire fraud convictions because district court excluded evidence about what outside experts

18 told the defendant about the legality of her scheme).  It is for this reason that both the

19 language in Instruction No. 19 stating the government did not have to prove that Mr. Smith

20 knew his omissions were unlawful and the erroneous deliberate ignorance instruction

21 corrupted the requisite mens rea.

22      The Supreme Court has recently emphasized that the maxim "ignorance of the

23 law" is no excuse only "applies where a defendant has the requisite mental state in respect

24 to the elements of the crime but claims to be 'unaware of the existence of a statute

25 proscribing the conduct.'"  *Rehaif v. United States*, 139 S. Ct. 2191, 2198 (2019) (holding

26 that defendant has to know his prohibited status for felon-in-possession statute).  "In

27 contrast, the maxim does not normally apply where a defendant 'has a mistaken impression

28 concerning the legal effect of some collateral matter and that mistake results in his

misunderstanding the full significance of his conduct,' thereby negating an element of the offense." *Id.* Thus, "a mistake of law is a defense if the mistake negates the knowledge required to establish a material element of the offense[,]" and "[m]uch of the confusion surrounding the ignorance-of-the-law maxim stems from the 'failure to distinguish these two quite different situations.'" *Id.*

The Ninth Circuit has similarly explained the confusion that the government's position continues to perpetuate in the very context of § 641, stating that "ignorance of the law" is a defense where the defendant lacks knowledge of the "legal status or condition that is one of the operative facts of the crime." *Fierros*, 692 F.2d at 1294. The Ninth Circuit used an example of a defendant "charged with embezzlement or theft of federal property in violation of 18 U.S.C. § 641, a crime requiring proof of specific intent." *Id.* In that instance (which of course is the situation here), it is a defense if the defendant believes his conduct is "legally authorized" because "the mistake of law is for practical purposes a mistake of fact." *Id.*

In this case, Mr. Smith's legal status as a "covered individual" and the provisions set forth in 24 C.F.R. § 982.161 constituted an operative fact of the crime. Indeed, the Court, at the government's urging, instructed the jury on the regulation. Doc. 557 (Instruction No. 23, discussed more below). Clearly, then, it was error to instruct the jury that the government is not required to prove that the defendant knew that his acts or omissions were unlawful. *See, e.g.*, *United States v. Liu*, 731 F.3d 982, 992-95 (9th Cir. 2013).

While this was significant error in itself, the deliberate ignorance instruction exacerbated the error. Instruction No. 20 stated that the government only needed to prove that Mr. Smith "was aware of a high probability that *HUD would conclude* he had a conflict of interest" and "deliberately avoided learning the truth." Doc. 557 (emphasis added). Again, the government's unsupported arguments in support of this instruction were incorrect. Doc. 552. In a federal criminal case, whether Mr. Smith was a covered individual under the regulation and had a conflict of interest was a question for the jury;

the decision was not HUD's, or even a decision for this Court. *See United States v. Gaudin*, 515 U.S. 506 (1995) (rejecting government's argument that mixed questions of law and fact, like the materiality element, are not for the jury).[4] Furthermore, with respect to the specific intent element, the jury was not supposed to determine what Mr. Smith believed HUD would conclude. Rather, the relevant question is what Mr. Smith himself believed in good faith.

The Ninth Circuit's decision in *United States v. Smith-Baltiher*, 424 F.3d 913 (9th Cir. 2005) is instructive. The defendant in *Smith-Baltiher* was charged with the specific intent crime of a being a deported alien who attempted to re-enter the country without the authorization of the Attorney General, and the question was how to determine whether the defendant was an alien and whether he had a good faith belief that he was a U.S. citizen so as to defeat the specific intent element of the crime. Like here, an administrative agency (then called the INS) had the authority to determine whether a person is a citizen and subject to deportation, and the INS had previously made those determinations and deported the defendant on four separate occasions (he had also even pled guilty to the same offense on two prior occasions). *Id.* at 916. The government argued that citizenship "is a question to be decided exclusively by the Attorney General, or his designated successor, the Secretary of the Department of Homeland Security, and may not be reviewed by a court, or, even more so, by a jury." *Id.* at 921. Citing cases such as *Gaudin*, the Ninth Circuit firmly disagreed, holding that whether the defendant was a U.S. citizen was a question for the jury. *Id.* at 921-22.

Likewise, citing cases like *Fierros*, the Ninth Circuit further held that the defendant

---

[4] Even as a civil matter, the ultimate decision regarding the applicability of the regulation is not HUD's, as it is an administrative agency subject to judicial review. *See Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) (agency's ethics rules in the CFR are subject to judicial review). While the Court cannot take the question away from the jury under cases like *Gaudin*, it can of course grant a Rule 29 motion *in favor* of the defendant. The Court should do so as to the "covered individual" and related conflict questions in accordance with *Skilling*. *See Skilling*, 561 U.S. at 411 n.44.

had the right to present a defense that he believed in good faith that he was a U.S. citizen, regardless of whether he believed that the INS would agree and consent to his entry. *Id.* at 923-25. The exact same analysis applies here, demonstrating that the deliberate ignorance instruction was flawed. Not only was Instruction No. 20 simply wrong in this regard, but, as a practical matter, it called for so many levels of speculation that it was unconstitutionally vague. Who at "HUD" was Mr. Smith supposed to speculate would probably find that he had conflict of interest: some official at the regional office, a HUD attorney, the Secretary, a federal judge who would review HUD's decision? "Who knows. Uncertainty of that kind cannot be squared with the beyond-a-reasonable-doubt standard applicable in criminal trials or with the need to express criminal laws in terms ordinary persons can comprehend." *Burrage v. United States*, 571 U.S. 204, 218 (2014).

In sum, Instruction Nos. 19-20 erroneously diluted the critical mens rea element. The government repeatedly emphasized the deliberate ignorance instruction during closing arguments, Tr. 3408, 3478 (Dec. 6, 2021), demonstrating that the instructional error was particularly prejudicial. *See, e.g.*, *United States v. Munguia*, 704 F.3d 596, 604-05 (9th Cir. 2012).

## B. Instruction No. 29 further undermined the mens rea element

Over objection, Tr. 3299-3308, the Court gave Instruction No. 29 entitled "Proof of Knowledge or Intent" that stated:

> The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. Because direct proof of knowledge and fraudulent intent of what a person is thinking is almost never available, the state of mind of the defendant may be proved by circumstantial evidence. Intent to defraud can be inferred from, among other things, efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits. It can also be shown if the defendant acted with reckless indifference to the truth or falsity of his statements.

Doc. 557 (Instruction No. 29). This non-pattern instruction was defective for multiple reasons.

As an initial matter, it was an improper permissive inference instruction. "A permissive inference instruction allows, but does not require, a jury to infer a specified

conclusion if the government proves certain predicate facts. . . . [I]t violates due process 'if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.'" *United States v. Warren*, 25 F.3d 890, 897 (9th Cir. 1994) (quoting *Francis v. Franklin*, 471 U.S. 307, 314-15 (1985)). A permissive inference "instruction need not be unconstitutional for [the Ninth Circuit] to find it defective." *United States v. Rubio-Villareal*, 967 F.2d 294, 297 (9th Cir. 1992) (*en banc*).

Thus, *Rubio-Villareal* held, pursuant to supervisory powers, that a permissive inference instruction, "which told the jury it could infer knowledge from two isolated facts – that the defendant was the driver and that cocaine was concealed in the body of the vehicle[,]" was improper. *Id.* at 298. The Ninth Circuit found that the instruction: (1) "implie[d] that the court had 'prejudged a conclusion which the jury should reach on its own volition[;]'" and (2) "focused the jury on some rather than all the facts" creating "the possibility that a jury may ignore exculpatory evidence." *Id.* at 299 (citation omitted).

Instruction No. 29 violated due process because an intent to defraud could not reasonably be drawn from the facts specified. For example, the fact that a person earns profits does not in any way create an inference of an intent to defraud; if profits were so indicative, all successful entrepreneurs better beware. Likewise, using the alleged misrepresentation itself as an inference of an intent to defraud essentially negates the fact that they are two separate elements of the offense; one could certainly understand why the government would like "to kill two elements with one stone," but such a desire does not justify a permissive inference instruction. And, the instruction to permit an inference of fraudulent intent from "reckless indifference" again sought to blur the separate elements and was particularly inappropriate without providing a definition of *criminal* recklessness. *See United States v. Rodriguez*, 880 F.3d 1151, 1159-61 (9th Cir. 2018) (reversing based on erroneous recklessness instruction and distinguishing the requisite inferences for criminal and civil recklessness).

Even if the instruction did not amount to a constitutional violation, it was improper under *Rubio-Villareal*, as it focused the jury only on the government's theories of criminal

intent, creating the possibility that the jury would ignore the defense evidence. Indeed, "it is the government's job, not the court's, to make sure the jury doesn't draw incorrect inferences." *United States v. Ramirez*, 714 F.3d 1134, 1139 (9th Cir. 2013). It is not the court's function to "help" the jurors draw inferences or to "fill[] in the evidentiary gap" that "the government had left in its case." *Id.* Instruction No. 29 improperly did just that, and the instruction's excuse for the government's lack of proof – that knowledge and intent ordinarily may not be proved by direct evidence – is highly questionable.

The instruction also erroneously "marshaled" the evidence in the government's favor. Marshaling "has fallen into widespread disfavor" and "is rarely practiced in federal court." *United States v. Mundy*, 539 F.3d 154, 158-59 (2d Cir. 2008). "Judges cannot marshal the evidence without exercising their own judgment on how evidence should be described, which aspects should be stressed, which aspects ignored. In doing so, courts inescapably influence the jury on decisions which should be the jury's sole province." *Id.* at 158. "In contemporary administration of justice, what conclusions should, or should not be drawn from the evidence are generally left to counsel to argue." *Id.* at 157. When a party objects to such an inference instruction, it should not be given because any potential benefits do not outweigh the harms. *Id.* In short, the Court should not have given Instruction No. 29 over objection.

Furthermore, because the judge's words exert a tremendous influence on jurors, *see Quercia v. United States*, 289 U.S. 466, 470 (1933), even if a charge like Instruction No. 29 could somehow be given, it at least had to be evenhanded; in other words, it had to cover evidence or theories favorable to the defendant as well as that favorable to the government. *See Starr v. United States*, 153 U.S. 614, 626 (1894) (instruction "if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him"). An instruction cannot "call to the jury's attention most of the evidence offered by the government" but make no "mention of the evidence adduced by the defense." *United States v. Dunsmore*, 446 F.2d 1214, 1217-18 (8th Cir. 1971); *see Smith v. Curry*, 580 F.3d 1071, 1083 (9th Cir. 2009) (overturning conviction because

1  instruction "was not neutral by any reasonable standard"); *United States v. Levy*, 578 F.2d

2  896, 903 (2d Cir. 1978).

3        Contrary to this precedent, Instruction No. 29 was erroneously "one-sided."

4  *Dunsmore*, 446 F.2d at 1217-18.  It was entitled "Proof of Knowledge or Intent,"

5  suggesting such proof had been offered.  The instruction mentioned "efforts to conceal *the*

6  *unlawful activity*," as if unlawful activity had been proven.  Most importantly, the

7  instruction focused on the government's theories demonstrating guilty intent without

8  mentioning any of the defense theories undermining that critical element, nor did it include

9  any language from the typical "good faith" instruction that is given in fraud cases, which

10 was not given here, *see United States v. Amlani*, 111 F.3d 705, 717-18 (9th Cir. 1997), to

11 counter-balance the one-sided charge.

12       In sum, Instruction No. 29 was flawed in multiple respects and was erroneously

13 given.  Whether to draw the disputed inference of criminal intent from the government's

14 factual theories, just like how to evaluate the historical facts, was the province of the jurors.

15 *See Mundy*, 539 F.3d at 157 ("Whether inferences should be drawn from the evidence, and

16 if so, which inferences, are matters of logic and experience — not of law . . . . what

17 inferences are suggested, or conclusively established by, the evidence are matters to be

18 argued to the jury by counsel.").

19     **C.  The instructions on omissions and duty to disclose were erroneous**

20       Over objections, Tr. 3247-52 (Dec. 3, 2021), the Court gave instructions on an

21 omissions theory of property fraud and the duty to disclose that were flawed, as they too

22 misstated the law, were worded in a non-neutral manner, and were otherwise confusing.

23 The initial flaw is in Instruction No. 16, which stated:  "To find that the defendant omitted

24 material facts, you must find that the defendant had a duty to disclose the omitted facts

25 arising out of 24 C.F.R. § 982.161(a)(2) and the HAP contracts."  Doc. 557.

26       Instruction No. 16 was completely different from the Ninth Circuit model

27 instruction, which states:  "To convict a defendant of wire fraud based on omission[s] of

28 material fact[s], you must find that a defendant[s] had a duty to disclose the omitted fact[s]

arising out of a relationship of trust.  That duty can arise either out of a formal fiduciary relationship, or an informal, trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance that it would ordinarily exercise."  Ninth Circuit Model Instruction No. 15.35.  As the pattern instruction indicates, a relationship of trust creates a duty to disclose, not a contract or regulation.  *See United States v. Shields*, 844 F.3d 819, 822-23 (9th Cir. 2016).

A duty to disclose "may derive from an independent explicit statutory duty created by legislative enactment."  *United States v. Dowling*, 739 F.2d 1445, 1449 (9th Cir. 1984), *rev'd on other grounds*, 473 U.S. 207 (1985).  A regulation, however, is not a *statute* enacted by Congress, nor obviously is a contract.  Indeed, a civil regulation cannot establish an element of a criminal offense in this context.  *See United States v. White Eagle*, 721 F.3d 1108, 1114 (9th Cir. 2013); *United States v. Wolf*, 820 F.2d 1499, 1505 (9th Cir. 1987).  The regulation may permit the government to terminate a HAP contract or perhaps be the basis for a civil lawsuit, but it cannot supply an element of a criminal offense.  For this reason alone, the instructions were defective.

Furthermore, the wording of Instruction No. 16 was erroneously confusing, as whether Mr. Smith had a duty to disclose is a separate (although related) factual inquiry from whether he in fact failed to disclose material facts.  By stating, "duty to disclose *the* omitted facts," the instruction also improperly suggested that Mr. Smith had in fact omitted material facts.  This suggestion that Mr. Smith had omitted material facts was repeated in both Instruction Nos. 23 and 24.  Instruction No. 23 began:  "The defendant had a duty to disclose to GHURA and HUD *the omitted facts concerning his interest or prospective interest* under the conflict of interest prohibition provision in" the regulation if he was a covered individual.  Doc. 557 (emphasis added).  Instruction No. 24 began in a similar fashion.  The instructions unfairly suggested that Mr. Smith had indirect or prospective interests and had omitted those facts.

Finally, Instruction No. 23 stated that the "duty to disclose applied during the covered individual's tenure and for one year thereafter."  Doc. 557.  While the prohibition

1  on payment may extend to one year after termination of service, nothing in the regulation
2  states that a person has to continue to make disclosures after his service is terminated.

3  **D. Conclusion**

4        Each of these significant jury instructions errors independently merits a new trial,
5  as they were not harmless beyond a reasonable doubt. *See McDonnell v. United States*,
6  136 S. Ct. 2355, 2375 (2016). Certainly, in combination, the errors built on each other and
7  establish that the jury was not given correct legal guidance on the fraud offense, thereby
8  tainting the fairness of Mr. Smith's trial. *See United States v. Preston*, 873 F.3d 829, 835
9  (9th Cir. 2017). Once again, because the underlying offenses cannot be sustained due to the
10 instructional error, the money laundering convictions must also be set aside, *see, e.g.*,
11 *Garrido*, 713 F.3d at 998-99, and thus Mr. Smith should receive a new trial on all counts.

12 **IV. The Court should grant a judgment of acquittal and dismiss Count 28.**

13       **A. Introduction**

14       The Court should grant judgments of acquittal or a new trial on all counts for the
15 numerous reasons discussed above. As set forth below, there are two additional reasons
16 unique to Count 28 requiring an acquittal and dismissal of that count. First, the § 641
17 charge in Count 28 was filed outside of the statute of limitations. Second, the government
18 did not prove a theft of money "of the United States or of any department or agency
19 thereof[,]" 18 U.S.C. § 641, as required under the statute.

20       **B. The § 641 charge in Count 28 was outside the limitations period**

21       The § 641 charge in Count 28 is governed by a 5-year statute of limitations. *See* 18
22 U.S.C. § 3282(a); *United States v. Green*, 897 F.3d 443, 448 (2d Cir. 2018). Despite the
23 allegation in the indictment, § 641 is *not* a continuing offense for statute of limitations
24 purposes under *Toussie v. United States*, 397 U.S. 112 (1970). *See Green*, 897 F.3d at 448-
25 49; *United States v. Yashar*, 166 F.3d 873, 876 (7th Cir. 1999). "The statute of limitations
26 for prosecuting an offense runs from the moment the offense is completed," and, if an
27 offense is not continuing under *Toussie*, then "completion occurs at the moment the
28 defendant's conduct satisfies every element of the offense." *Green*, 897 F.3d at 448. Here,

Count 28 alleged a theft as early as March 2011, Doc. 1, and the government specifically asserted at trial that every element of the § 641 offense was satisfied in 2011. Tr. 3344-45 (Dec. 4, 2021). The indictment, however, was not returned until March 14, 2017, after the 5-year limitations period had expired.

The *Yashar* opinion, which considered the related § 666 offense, is directly on point. Like the instant indictment, the government asserted that the theft violation in *Yashar* involved a "continuing course of conduct" that "straddle[d]" the limitations period, and therefore there was "no limitations problem." *Yashar*, 166 F.3d at 876. The court "reject[ed] this approach as inconsistent with *Toussie* as well as other cases, and as contrary to the purpose of the statute of limitations." *Id.* at 877. *Yashar* "found little support . . . for the contention that if the government charges a course of conduct as one offense, that offense is not 'committed' for limitations purposes until the entire course of conduct is completed." *Id.*

"With this approach, the limitations period would be virtually unbounded. . . . This approach would transform the limitations period from a check on governmental delay in prosecution to a function of prosecutorial discretion." *Id.* at 879. The "goals" of a statute of limitations "can only be promoted by an interpretation that starts the limitations period when all elements of the crime are first present." *Id.* In other words, "for offenses that are not continuing offenses under *Toussie*, the offense is committed and the limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct." *Id.* at 879-80.

Under cases like *Yashar* and *Green*, § 641 is not a continuing offense for purposes of *Toussie*, regardless of the government's decision to charge Count 28 as a purportedly continuing course of conduct. The statute of limitations therefore began to run the moment that all elements were first satisfied. Here, the government contends that all elements were first satisfied in 2011, *see* Tr. 3344-45 (Dec. 4, 2021), and thus Count 28, which was filed in 2017, is untimely. The Court should therefore enter an acquittal or arrest judgment and dismiss Count 28. *See Liu*, 731 F.3d at 998.

**C. There was insufficient evidence of money "of the United States" for § 641**

Section 641 requires the government to prove theft of money "of the United States or of any department or agency thereof . . . ." 18 U.S.C. § 641. The government proved that the HAP payments came from GHURA's bank accounts, and the indictment itself acknowledged that GHURA is "a component of the Government of Guam[,]" Doc. 1, not a department or agency of the United States. Thus, the government failed to prove an element of the § 641 offense, as it failed to prove a theft from a department or agency of the United States.

Admittedly, in *United States v. Johnson*, 596 F.2d 842, 844-46 (9th Cir. 1979), the Ninth Circuit held that funds transferred from HUD to a local agency constituted funds "of the United States" if HUD "retains substantial supervision and control over the funds." While this rule may have supported the government's approach in this case, the Supreme Court effectively overruled the *Johnson* standard in *Tanner v. United States*, 483 U.S. 107, 130-32 (1987).

*Tanner* rejected the government's argument that "substantial ongoing federal supervision" of the transferred funds was sufficient and explained: "Given the immense variety of ways the Federal Government provides financial assistance, and the fact that such assistance is always accompanied by restrictions on its use, the inability of the 'substantial supervision' test to provide any real guidance is apparent." *Id.* at 132. The "substantial supervision" standard would "in effect, substitute[] 'anyone receiving federal financial assistance and supervision' for the phrase 'the United States or any agency thereof[,]'" which is simply not the way the statute is written. *Id.* Since *Tanner*, the Supreme Court has confirmed that the narrow language used by Congress means that funds must be stolen from the federal agency, not from a local agency that receives federal assistance. *See Allison Engine Co. Inc. v. United States ex rel. Sanders*, 553 U.S. 662, 673 (2008).

Congress used different language in a related statute, § 666, supporting the Supreme Court's view in *Tanner* that the money or property must actually be taken from

1 the United States, not from a local agency that receives federal funds, no matter how much
2 federal supervision is involved. Section 666 applies to theft offenses if the local
3 "organization, government, or agency receives, in any one year period, benefits in excess
4 of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee,
5 insurance, or other forms of Federal assistance." 18 U.S.C. § 666(b). If Congress had
6 intended for theft of funds from a local agency receiving federal assistance to fall under §
7 641, it would have used the language that it used in the related § 666 statute. *See Custis v.*
8 *United States*, 511 U.S. 485, 491-92 (1994).

9        Ironically, the government appeared to recognize that it should have prosecuted
10 under § 666, rather than § 641, and may have intended to do so because paragraph two of
11 the indictment alleged that GHURA "received federal operating subsidies in excess of
12 $10,000 under an annual contributions contract with HUD." Doc. 1. The government,
13 however, erroneously proceeded to prosecute under § 641, not § 666, and therefore failed
14 to prove a critical element of the offense. Accordingly, this Court should enter a judgment
15 of acquittal on the § 641 charge in Count 28.

16                              **CONCLUSION**

17        For the foregoing reasons, the Court should enter an Order granting judgments of
18 acquittal, a new trial, and arresting judgment on all counts.

19

20        RESPECTFULLY SUBMITTED this 12th day of April, 2022.

21

22                                    By:      *s/Benjamin L. Coleman*
                                              BENJAMIN L. COLEMAN
23
                                              *s/Michael Phillips*
24                                            MICHAEL PHILLIPS

25                                            *Counsel for Defendant Mark S. Smith*

26

27

28