**IN THE DISTRICT COURT**
**FOR THE TERRITORY OF GUAM**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL CASE NO. 1:17-cr-00020 |
| Plaintiff, | |
| vs. | **DECISION AND ORDER GRANTING IN PART DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL** |
| MARK S. SMITH, | |
| Defendant. | |

On December 8, 2021, a jury found Defendant Mark S. Smith guilty of conspiracy to commit wire fraud, conspiracy to commit money laundering, theft of government property, and multiple counts of wire fraud, money laundering, and laundering of monetary instruments. (Verdict, ECF No. 561.) Defendant now moves for a judgment of acquittal on all counts, or alternatively for a new trial or arrest of judgment. (Mot., ECF No. 622.) The main issue presented before the Court is whether the Government has proven property fraud for purposes of the federal wire fraud statute. The matter was fully briefed (*see* Opp'n, ECF No. 639; Reply, ECF No. 643) and came on for a hearing on May 17, 2022, during which time the Court noted its inclination to grant the motion as to all the wire fraud counts and the related conspiracy count, but took the matter under advisement (Min., ECF No. 648). Having considered the parties' briefs, oral arguments, and relevant case law, the Court concludes that no rational trier of fact could find that all the essential elements of the wire fraud crime was proven beyond a reasonable doubt. Accordingly, the Court now issues this decision and order GRANTING

IN PART Defendant's motion for judgment of acquittal, specifically as to Count 1 (Conspiracy to Commit Wire Fraud) and Counts 2 through 27 (Wire Fraud).

## I. BACKGROUND

On March 14, 2017, a grand jury returned a 56-count Indictment against Defendants Mark S. Smith and Glenn D. Wong on allegations involving a scheme for Mark Smith as a landlord to continue to directly or indirectly receive Housing Assistance Payments ("HAP") during his tenure as legal counsel for the Guam Housing and Urban Renewal Authority ("GHURA"), despite United States Department of Housing and Urban Development ("HUD") regulation 24 C.F.R. § 982.161(a)(2) and the HAP contract's prohibition of such conflict-of-interest. (Indictment, ECF No. 1.) The scheme involved Smith transferring rental properties to Wong, thereby hiding any interests that Smith had in the properties, so that Wong could receive the HAP payments that would then indirectly go to Smith through transfers to Smith's various accounts or via cash. *Id.* Defendant Glenn Wong has since passed away and the Court dismissed the Indictment against him (Order Dismissing Wong, ECF No. 345); a jury trial proceeded for the sole remaining defendant Smith. The 34 counts against Smith that were decided by the jury are: one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 1349 and 1343 (Count 1); twenty six counts of Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 2 through 27); one count of Theft of Government Property, in violation of 18 U.S.C. § 641 (Count 28); one count of Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (h) and 1957 (Count 29); three counts of Engaging in Monetary Transactions with Proceeds of Specified Unlawful Activity, in violation of 18 U.S.C. §§ 1957 and 2 (Counts 30, 33, and

34); and two counts of Laundering of Monetary Instruments, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (Counts 38 and 45). (Indictment, ECF No. 1.)

A jury trial was held for 24 days over the course of several weeks starting October 28, 2021. (Mins., ECF Nos. 447, 558.) After the Government closed its case in chief on December 3, 2021, Defendant moved for judgment of acquittal, which the Court denied. (Min., ECF No. 553.) On December 8, 2021, the jury found Smith guilty on all 34 counts. (Verdict, ECF No. 561.) Defendant then retained new counsel and sought an extension of time beyond the general 14 days to file post-trial motions (ECF No. 566), which this Court granted (Min., ECF No. 573).

Defendant now moves for judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29, for a new trial pursuant to Rule 33, and to arrest judgment pursuant to Rule 34. (Mot., ECF No. 622.) For the first time in the history of this case, Defendant seeks acquittal on all counts on the basis that the Government's theory of property fraud was defective, as it was really an uncharged honest services theory. Additionally, as to Count 28 (theft of government property), Defendant argues that the charge falls outside the statute of limitations and evidence presented at trial failed to demonstrate money "of the United States." Defendant additionally argues that a new trial is warranted because the Government improperly argued an honest-services theory and legal-fees theory in summation, and because jury instructions 16, 19, 20, 23, 24, and 29 were improper.

## II.  LEGAL STANDARD

Federal Rule of Criminal Procedure 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

3

Fed. R. Crim. P. 29(a). "A defendant may also move for a judgment of acquittal, or renew such a motion, within 14 days[1] after a guilty verdict or after the court discharges the jury, whichever is earlier." Fed. R. Crim. P. 29(c)(1). "The evidence is to be considered in the light most favorable to the government to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201 (9th Cir. 2000) (citation omitted) (emphasis added); *see United States v. Begay*, 673 F.3d 1038, 1043 (9th Cir. 2011). "Further, all reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be resolved in favor of the jury's verdict." *Alvarez-Valenzuela*, 231 F.3d at 1201-02. "If there appears some doubt, so that the court believes the jury might disagree, the motion must be denied." *United States v. Figuerora-Paz*, 468 F.2d 1055, 1058 (9th Cir. 1972). "[A] jury's verdict is not to be disturbed lightly." *Begay*, 673 F.3d at 1043.

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a).

Federal Rule of Criminal Procedure 34 provides that "the court must arrest judgment if the court does not have jurisdiction of the charged offense." Fed. R. Crim. P. 34(a). To arrest judgment, it must be "based on the record, to-wit: the indictment, the plea, the verdict and the sentence" and not based on evidence. *People of Territory of Guam v. Palomo*, 511 F.2d 255, 259 (9th Cir. 1975).

/ /

/

---

[1] The Court granted Defendant's motion for an extension of time to file the motions. (ECF No. 566.)

### III.    DISCUSSION

The Court will first address Defendant's main argument regarding the Government's defective property fraud theory of federal wire fraud, as that is the crux of Defendant's motion.

### A.  Wire Fraud Counts

At the heart of Defendant's argument for acquittal as to the wire fraud charges is that the Government's property fraud theory was defective, as it was really, as put in the words of the Ninth Circuit in *United States v. Yates*, 16 F.4th 256, 268 (9th Cir. 2021), "effectively an honest-services case dressed in the garb of" a property fraud case. (*See* Mot. at 7.) In other words, the Defendant was indicted by the grand jury with a property fraud theory for wire fraud, but the Government only provided evidence regarding an improper honest services theory. The Court must therefore determine whether *any* rational juror could have found beyond a reasonable doubt that the Government proved all the elements of a wire fraud offense based on the charged property fraud theory. The Court finds that a discussion of the elements of wire fraud as well as the development of case law surrounding the property fraud and honest services fraud dichotomy is key to the analysis.

The wire fraud statute criminalizes:

> [w]hoever, having devised or intending to devise any scheme or artifice to defraud, or *for obtaining money or property* by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . .

5

18 U.S.C. § 1343 (emphasis added). Section 1346 expands the definition of "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

In this case, the jury was given the following jury instruction:

> The defendant is charged in Counts 2 through 27 of the indictment with wire fraud, in violation of Title 18, United States Code, Section 1343. In order for the defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt:

> > First, the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining *money or property* by means of false or fraudulent pretenses, representations, or promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;

> > Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with *money or property*;

> > Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

> > Fourth, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

(Final Jury Instructions No. 16 ("Wire Fraud"), ECF No. 557 (emphasis added).); *see* Ninth Cir. Model Jury Instructions 15.35 (2022). As to the third element, a defendant acts with the intent to cheat when he acts with the intent "to deprive a victim of money or property" by means of deception. *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020); Final Jury Instructions No. 17 ("Intent to Defraud-Defined").

6

In contrast, to find a defendant guilty of wire fraud based on an honest services theory in violation of § 1343 and § 1346, the government must prove beyond a reasonable doubt that:

> First, the defendant devised or knowingly participated in a scheme or plan to deprive [a victim] of his or her right of honest services;
>
> Second, the scheme or plan consists of a bribe or kickback in exchange for the defendant's services. The "exchange" may be express or may be implied from all the surrounding circumstances;
>
> Third, the defendant owed a fiduciary duty to [the victim];
>
> Fourth, the defendant acted with the intent to defraud by depriving [the victim] of his or her right of honest services;
>
> Fifth, the defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing, [a person's or an entity's] acts; and
>
> Sixth, the defendant used, or caused someone to use, an interstate or foreign wire communication to carry out or to attempt to carry out the scheme or plan.

*See* Ninth Cir. Model Jury Instructions 15.34 (2022) (cleaned up and modified to apply to wire fraud).

The former theory involves tangible money or property, while the latter involves an intangible right to honest services. The distinctions between these two theories are made clearer by a history of the case law, with *McNally v. United States*, 483 U.S. 350 (1987), as the starting point.

Prior to *McNally*, federal prosecutors had been using the mail fraud (Section 1341) and wire fraud (Section 1343) statutes to attack various forms of corruption that deprived victims of "intangible rights" of honest services unrelated to money or property, and courts have upheld the use of those statutes. *See McNally*, 483 U.S. at 360. "Because the two phrases identifying the proscribed schemes

appear in the disjunctive,[2] it is arguable that they are to be construed independently and that the money-or-property requirement of the latter phrase does not limit schemes to defraud to those aimed at causing deprivation of money or property." *Id*. at 358. The Court in *McNally* noted that this was the approach taken by courts of appeals addressing the issue of whether "schemes to defraud include those designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly." *Id*. But, "[i]n 1987, [the United States Supreme Court], in *McNally*, stopped the development of the intangible-rights doctrine in its tracks." *Skilling v. United States*, 561 U.S. 359, 401 (2010). *McNally* involved a state officer who, in selecting Kentucky's insurance agent, arranged to procure a share of the agent's commissions via kickbacks paid to companies the official partially controlled. *See McNally*, 483 U.S. at 360. The Supreme Court reversed the conviction of two individuals charged under Section 1341's mail fraud statute with participating in "a self-dealing patronage scheme [that] defrauded the citizens and government of Kentucky of certain 'intangible rights,' such as the right to have the Commonwealth's affairs conducted honestly." *Id*. at 352. In reviewing the legislative history of Section 1341, the U.S. Supreme Court noted that "the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property," and that it "does not refer to the intangible right of the citizenry to good government." *Id.* at 356. The Court determined that "[r]ather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of

---

[2] While the Court in *McNally* was addressing the mail fraud statute, the wire fraud statute also involves "any scheme or artifice to defraud, or for obtaining money or property." *See* 18 U.S.C. § 1343.

8

disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights." *Id*. at 360.

In response, "[t]he following year, Congress amended the law specifically to cover one of the 'intangible rights' that lower courts had protected under § 1341 prior to *McNally:* 'the intangible right of honest services.'" *Cleveland v. United States*, 531 U.S. 12, 19 (2000) (citing Anti–Drug Abuse Act of 1988, § 7603(a), 18 U.S.C. § 1346.) 18 U.S.C. § 1346 was passed and provides that: "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Section 1346 expressly provided for an intangible right of honest services theory for mail and wire fraud. Subsequent case law then distinguished between a property fraud legal theory and an intangible honest services theory and made clear that a property fraud theory required a scheme involving tangible property or money.

For example, five years after *McNally*, the Ninth Circuit in *United States v. Bruchhausen*, 977 F.2d 464, 467 (9th Cir. 1992) recognized that "[t]he wire fraud statute is not limited to possessory interests, and can extend to rights in intangible property." However, because Section 1346 dealt with honest services, the Ninth Circuit determined that the property interest alleged did not support a criminal prosecution under that theory, nor could it support a criminal prosecution under the money or property theory of wire fraud. *Id*. at 468. In *Bruchhausen*, the defendant was charged with a scheme to defraud American manufacturers by buying sophisticated technology, promising falsely that the purchased equipment would be used only in the United States, and then smuggling the goods to countries in the Soviet Bloc. *Id*. at 466. Representatives from the manufacturing companies testified that they would not have sold to defendant Bruchhausen had they known the truth. *Id*. The indictment

9

alleged as part of the scheme that defendant's objective was "[to] defraud American manufacturers of high-technology commodities of their property and their right to make business decisions based on truthful information and representations." *Id*. at 467. In addressing whether manufacturers were defrauded of "property" within the meaning of the wire fraud statute, the Ninth Circuit held that Bruchhausen had not defrauded the manufacturers of "property interests." *Id*. at 469. The court reasoned: "The manufacturers received the full sale price for their products," and that "they clearly suffered no loss." *Id*. at 467. "While they may have been deceived into entering sales that they had the right to refuse, their actual loss was in control over the destination of their products after sale." *Id*. at 467. The court further noted, however, that such "interest in the disposition of goods it no longer owns is not easily characterized as property." *Id*. at 468. Relying on *McNally* and noting that *McNally* also similarly involved "no showing that the state paid more for its policies than it otherwise would have, or that it received less insurance," the court held "that the interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law is not 'property' of the kind Congress intended to reach in the wire fraud statute." *Id*.

Thirteen years after *McNally*, the Supreme Court again addressed the property fraud theory. In *Cleveland v. United States*, 531 U.S. 12, 20 (2000), the issue presented was "whether, for purposes of the federal mail fraud statute, a government regulator parts with 'property' when it issues a license." Defendant Cleveland and others were prosecuted under section 1341's mail fraud statute for making false statements in applying to the Louisiana State Police for a license to operate video poker machines. *Id*. at 15. Relying on *McNally*, the Supreme Court held that a "license" is not "property" in the government's hands for purposes of section 1341, as the state's core interest in the license is

10

"*regulatory*." *Id*. at 20 (emphasis added). The Court further rejected the government's contention that the state had a property interest in a license because it receives money in exchange for the licenses, clarifying instead that "[i]t does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Id*. at 15. The Court also rejected the government's property interest theory based on the state's "right to control" the issuance, renewal, and revocation of video poker licenses, as "these intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to *regulate*." *Id*. at 23 (emphasis added). The Court declined to recognize such a broad reading of the mail fraud statute, as it would "invite[] us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress" and "subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." *Id*. at 24. Because there was no assertion that that video poker license scheme implicated the intangible rights to honest services, the Court did not reach that issue. *Id*. at 20.

The intangible rights to honest services theory was squarely addressed in *Skilling v. United States*, 561 U.S. 359, 399 (2010), albeit through a challenge to 18 U.S.C. § 1346 for constitutional vagueness. In *Skilling*, the former Enron Corporation chief executive officer was charged for engaging in a scheme to deceive public investors about Enron's true financial performance by manipulating its publicly reported financial results and making false and misleading statements about Enron's financial performance. *Id*. at 369. After reviewing the history of the statute, the *Skilling* Court held that: "[t]o preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." *Id*. at 407. In limiting it

to just bribes and kickbacks, the *Skilling* Court expressly rejected the government's proposed theory of liability based on an undisclosed conflict of interest conduct—namely, the "undisclosed self-dealing by a public official or private employee—i.e., the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty"—in light of due process concerns.[3] *Id*. at 409 (internal quotation marks omitted). It further clarified that *McNally* was not just a failure to disclose a conflict of interest; "rather, the official conspired with a third party so that both would profit from wealth generated by public contracts." *Id*. at 410. The *McNally* case itself presented a paradigmatic kickback fact pattern. *Id*. at 407.

More recent cases have highlighted the limitations placed under *Skilling* and the type of property interest protected under the traditional wire fraud theory. In *Kelly v. United States*, 140 S.Ct. 1565, 1569 (2020), for example, the Supreme Court reversed the federal fraud convictions of two members of the New Jersey Governor's staff who used their regulatory authority to close lanes of traffic on a bridge as an act of political retribution but devised a scheme of a traffic study as their cover up. Highlighting again that the wire fraud statute prohibits only deceptive "schemes to deprive [the victim of] money or property," and relying on *McNally*, *Cleveland*, and *Skilling*, the Court rejected the government's property fraud theory based on "commandeering" the bridge or "tak[ing] control" of the lanes, as an exercise of those powers were merely regulatory. *Id*. at 1571-72. As to the

---

[3] The Supreme Court noted that it would leave many questions such as: "How direct or significant does the conflicting financial interest have to be? To what extent does the official action have to further that interest in order to amount to fraud? To whom should the disclosure be made, and what information should it convey?" *Skilling*, 561 U.S. at 411 n.44.

government's second theory based on loss of employee compensation, the Court rejected that theory because the loss was only incidental. *Id*. at 1572. In other words, the "property must play more than some bit part in a scheme: It must be an 'object of the fraud.'" *Id*. at 1573 (citation omitted). "[P]ut differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id*.

The Ninth Circuit more recently addressed this issue in *United States v. Yates,* 16 F.4th 256, 267 (9th Cir. 2021), a case involving bank executives charged with conspiracy to commit bank fraud for misrepresenting the condition of their bank.[4] The government charged the defendants with property fraud, not honest-services fraud. But in describing the deprivation of "'something of value,' the government told the jury that the defendants 'sought to deprive' the bank and the board of directors of 'accurate financial information in the bank's books and records.'" *Id*. at 265. The Ninth Circuit majority panel concluded that this "accurate-information theory is legally insufficient" as "[t]here is no cognizable property interest in 'the ethereal right to accurate information.'" *Id.* The government also argued that the defendants sought to deprive the bank of their salaries and moneys, which the Court noted are forms of money, "[b]ut there is a difference between a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to draw an existing salary—essentially, avoiding being fired." *Id*. at 266. "If obtaining a new job or a higher salary is the object of a defendant's fraudulent scheme, then the deprivation of that salary can

---

[4] The Supreme Court has construed "scheme or artifice to defraud" identically for the mail, wire, and bank fraud statutes. *Yates,* at 264 (*citing Neder v. United States*, 527 U.S. 1, 20-21, 119 S.Ct. 1827 (1999)).

13

in some circumstances support a fraud conviction." *Id*. But for the latter, the Court noted that *Skilling* rejected this salary-maintenance theory. *Id*. at 267. The Court also raised concerns that "[p]ermitting the government to recharacterize schemes to defraud an employer of one's honest services—thereby profiting 'through the receipt of salary and bonuses,' as schemes to deprive the employer of a property interest in the employee's continued receipt of a salary would work an impermissible 'end-run' around the Court's holding in *Skilling*." *Id*. at 267 (quoting *Skilling*, 561 U.S. at 413; *Kelly*, 140 S. Ct. at 1574) (internal citation omitted). But because the government did not distinguish between maintenance of existing salaries and receipt increased salaries or bonuses, the government's case was "effectively an honest-services case dressed in the garb of salary deprivation." *Id*. at 268. Notably, in *Yates*, the Court did recognize that a "bank has a property interest in its funds and that it has the right to use [its] funds as a source of loans that help the bank earn profits[,]" as well as a "right to decide how to use those funds." *Id*. at 268 (cleaned up). However, because the government also relied on two invalid theories, the error was not harmless. *Id*. at 269.

In light of *McNally*, *Cleveland*, *Skilling*, *Kelly*, as well as the Ninth Circuit cases of *Bruchhausen* and *Yates*, Defendant Smith argues that the Government's property fraud theory was defective from the start. Defendant contends that "[t]he government presumably recognized that, due to *Skilling*, it could not proceed against Mr. Smith on its failure to disclose a conflict of interest theory pursuant to § 1346, the honest services statute" and therefore to end-run *Skilling*, it "instead sought to revert back to § 1343, the property fraud statute[.]" (Mot. at 5.) But Defendant maintains that even assuming *arguendo* that (1) Smith was a covered individual, (2) Smith failed to disclose his interest, and (3) GHURA and HUD would not have issued the HAP payments had they known the hidden and

14

misrepresented facts, the Government did not prove property fraud, as the scheme did not deprive HUD or GHURA of property by cheating them monetarily and the "government entities paid a fair price for properties rented by deserving Section 8 tenants[.]" (Mot. at 2.) Defendant contends that the Government did not prove or allege that GHURA and HUD did not receive the rental units leased or that the prices were unfair, such that "from a monetary or property perspective, GHURA and HUD received what they paid for." (Mot. at 3.) Smith highlights that "to establish property fraud, the government must prove that the victim was cheated economically; that is, it paid a premium or received a substandard product," but the Government failed to prove so. (*See* Reply at 3.)

In response, the Government maintains that it never charged an honest services theory, and that throughout, it maintained a money or property fraud theory—specifically, the HAP payments that Smith and Wong fraudulently obtained from GHURA and HUD. (Opp'n at 3-4.) It notes that Count 1 charged a conspiracy to "execute a scheme and artifice to defraud HUD and GHURA to obtain money and property, to wit, Section 8 Program Housing Assistance Payments or HAP funds, by means of false and fraudulent pretenses, representations and promises, and material omissions . . . ." while Count 2 alleged that it was the object of the conspiracy for "defendants to unlawfully enrich themselves by materially misrepresenting to HUD, GHURA, and others their ownership and control of rental properties under the Section 8 Program in order to [inter alia] obtain HAP funds . . . ." (Indictment ¶¶ 20-21). Second, the Government argues that there is no loss element in wire fraud.[5] (Opp'n at 4.)

---

[5] The Court agrees with the Government that there is no loss element in wire fraud. *See Shaw v. United States*, 580 U.S. 63, 137 S.Ct. 462, 467 (2016) ("[W]e have held it 'sufficient' that the victim (here, the bank) be 'deprived of its right' to use of the property, even if it ultimately did not suffer unreimbursed loss.") (citing *Carpenter v. United States*, 484 U.S. 19, 26–27 (1987)); *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) ("But nothing in *Shaw* compels us to go

Third, it posits even if there were an unwritten loss requirement, Smith did inflict a loss because HUD and GHURA did not get what they paid for. (Opp'n at 5.) The Government emphasizes that the "entities paid for landlord services on condition they be provided by individuals and entities that GHURA and HUD deemed *eligible*," which went to "an essential aspect of the bargain." (*Id*. at 6-7.)

Because the Government maintains that it did not charge an honest services theory, and the Indictment supports this position, the Court need not address the issue of whether the Government has proved an honest-services wire fraud.[6] Rather, the Court must determine whether the Government proved *property* wire fraud. Defendant does not dispute that the Government charged a property fraud theory for wire fraud based on the HAP payments. Thus, the Government is correct in the sense that *McNally*, *Kelly*, and *Yates* are distinguishable to the extent that the charges in those cases did not involve a scheme targeting the victim's money or property. *See McNally*, 483 U.S. at 352, 360-361 (rejecting Government's wire fraud theory based on defrauding the citizens and government of Kentucky of certain intangible rights of honest services, but expressly noting that the jury was neither charged with finding that the Commonwealth itself was defrauded of any money or property such that the Commonwealth would have paid a lower premium or secured better insurance in the absence of the scheme, nor that the Commonwealth was deprived of control over how its money was spent);

---

so far as to hold that wire fraud requires an intent to permanently deprive the victim of property."); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 655 (2008) (rejecting that criminal fraud requires actual reliance). Nonetheless, deprivation of money or property must be the *object* of the fraud. *See, e.g. Kelly*, 140 S.Ct at 1573; *cf. Miller*, 953. F.3d at 1103 ("[W]ire fraud requires the intent to deceive *and* cheat — in other words, to deprive the victim of money or property by means of deception.").

[6] To be clear, an honest services theory would also fail in light of *Skilling*, as the Government made no mention of bribes or kickbacks received by the Defendants and only alleged a scheme based on an undisclosed conflict of interest, which was expressly rejected in *Skilling*. 561 U.S. at 409.

16

*Kelly*, 140 S. Ct. at 1569 (proceeding on a theory of commandeering a bridge and taking control of lanes); *Yates*, 16 F.4th at 265-267 (vacating bank fraud conspiracy conviction of two bank employees based on government's theories of deprivation of accurate financial information and salary-maintenance theory).

But what the Government charged and what the Government proved are two separate matters, and for purposes of a motion for judgment of acquittal, the Court must determine whether the Government *proved* property wire fraud such a that any rational juror can find that the evidence establishes all the elements for wire fraud beyond a reasonable doubt. Here, the Court finds that the Government has failed to do so.

Evidence established throughout trial showed that the HAP payments were given in return for rental units for Section 8 tenants, and that Defendant intended throughout the scheme to provide those rental units. Like in *McNally* and *Bruchhausen,* full economic value was given in exchange for the money or property taken. *See McNally,* 483 U.S. at 360-61 (insurance given in return for money); *Bruchhausen,* 977 F.2d 464 at 467 (money given in return for equipment). The Government even conceded at the hearing that prior to Smith becoming GHURA's legal counsel, his receipt of HAP payments as a landlord in return for providing rental units was lawful; what made the conduct suddenly unlawful was when he became GHURA's counsel and became subject to the conflict-of-interest provisions. It is from this change in Smith's circumstances that the Government contends deprived GHURA and HUD of a fair value because Smith and/or his designee was no longer "eligible." The Government asserts that full compliance with the HAP contract's provisions, including its conflict-of-

17

interest provisions, was a key and "essential aspect of the bargain" such that GHURA or HUD did not get what it paid for.

But this interest is not a property interest within the ambit of the federal wire fraud statute under Ninth Circuit precedent. Notably, the Government maintains that the property interest is the HAP funds, but the core interest that was proven at trial was that HUD and GHURA were really deprived of the *truth* about Smith and Wong's eligibility based on an undisclosed conflict of interest. In other words, the government entities were deprived of the right to accurate information, honest services, or to make an informed decision, however it can be phrased—all intangible interests expressly rejected in *McNally* and *Yates*. *See McNally,* 483 U.S. at 360; *Yates*, 16 F.4th at 265. The information that it was deprived of was not of *economic* value, as it would not have informed the Government on any decision based on pecuniary interests, but rather one that was merely regulatory.[7] Nor is an interest that the HAP payments go to an individual without a purported conflict-of-interest a property interest encompassed under the wire fraud statute. *See Bruchhausen*, 977 F.2d at 468 (noting that interest of manufacturers seeing that their products were not shipped in violation of federal law is not property within the wire fraud statute). Rather, as the Defendant puts it: "[i]t is inherently a regulatory interest that is focused on 'standards of disclosure' and 'good government', which do[es] not constitute tangible property rights under the statute." *See* Reply at 9; *see also Cleveland*, 531 U.S. at 15 (concluding that a license is regulatory and not a property interest recognized under wire fraud).

---

[7] While section 13 of the HAP contracts separately contained a conflict-of-interest provision, that provision was clearly derived from HUD's regulation.

While the Government might have proved a breach of contract claim, it did not prove a wire fraud case.

The Court of Appeals for the Sixth Circuit in *United States v. Sadler*, 750 F.3d 585, 590 (6th Cir. 2014) reached a similar result as the Ninth Circuit in *Bruchhausen*. In *Sadler*, the Sixth Circuit reversed the defendant's wire fraud conviction due to the government's failure to show that the defendant intended to deprive anyone of property when she lied to pharmaceutical distributors at the time she ordered pills for the clinic by using a fake name on her drug orders and by falsely telling the distributors that the drugs were being used to serve "indigent" patients. The *Sadler* court noted that "[a]ll that the evidence shows is that [defendant] paid full price for all the drugs she purchased and did so on time." *Id*. When the Government contended that she deprived the distributors of pills, the court's response was: "Well, yes, in one sense: The pills were gone after the transaction. But paying the going rate for a product does not square with the conventional understanding of 'deprive.'" *Id*.

Admittedly, the Government's position on this "essential aspect of the bargain" is supported in other Circuits.[8] The Tenth Circuit in *United States v. Richter*, 796 F.3d 1173, 1191-92 (10th Cir. 2015), for example, involved defendants who misrepresented to customers that they would lawfully and in an environmentally safe manner dispose of electronic devices. Although the customers relied

---

[8] The Second Circuit draws "a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) (*quoting United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991)). But even so, in the Second Circuit, the scheme "must deprive the victim of potentially valuable economic information" or "affect[] the victim's economic calculus or the benefits and burdens of the agreement." *Id*. at 570 (internal quotation marks and citations omitted).

on those representations and paid defendants to dispose of their devices in those manners, defendants instead disposed of it unlawfully. Defendants nevertheless argued that the mail and wire fraud scheme could not involve a deprivation of money because the e-waste removal services that were paid for were actually performed, just not the way the customers expected. Relying at least partially on *Bruchhausen*, defendants maintained that "the government's theory merely alleges the deprivation of an intangible property interest—the right to control the ultimate disposition of property (an 'alienation' theory)." *Id*. at 1192. But the Tenth Circuit was not persuaded by the Ninth Circuit's decision in *Bruchhausen* and determined that the customers hired defendants for the proper disposal, such that the fraud statutes covered this scheme to obtain payment for service by false pretenses. *Id*. at 1194.

In *United States v. Granberry*, 908 F.2d 278, 280-281 (8th Cir. 1990), the Eighth Circuit reversed a district court's dismissal of a mail fraud case, noting that "[t]he School District has been deprived of money in the very elementary sense that its money has gone to a person who would not have received it if all of the facts had been known," as what "the School District wanted was a competent school-bus driver who was truthful and had not been convicted of a felony, and this is not what it got."

Similarly, in *United States v. Kelerchian*, 937 F.3d 895 (7th Cir. 2019), the Seventh Circuit in a fairly recent case affirmed a wire fraud conviction where defendants misrepresented their reasons for purchasing machineguns from a gun importer and ultimately sold of the gun parts after their purchase. The Seventh Circuit declined to follow the Ninth Circuit's reasoning in *Bruchhausen,* noting that "[t]he *Bruchhausen* view fails to take into account the damage to goodwill from the illegal sale and, we add, the legal and regulatory risk that the seller faces in such deals." *Id*. at 913. It also disagreed

with the Ninth Circuit's conclusion and determined that a "seller's interest is not only in shipping goods legally, but also in not selling products in violation of federal laws," which "exists before the seller relinquishes ownership." *Id*. at 914.

Unfortunately for the Government, the positions of other circuits are not binding on this Court. This Court is bound by the Ninth Circuit decisions, and in the Ninth Circuit, *Bruchhausen* still stands. And in *Bruchhausen,* even though some of the sellers required as a condition before selling the technology that it remain in the United States, *see Buchhausen*, 977 F.2d at 470 (Fernandez, J., concurring), and Bruchhausen lied about that condition, the Ninth Circuit found this insufficient to support a wire fraud conviction in light of the fair value given in return for the property.

Here, the Government did not present any evidence establishing that GHURA would have paid less to a different landlord, or that Smith intended to obtain HAP payments higher than the value of the rental units provided, or that Smith intended to deprive GHURA of money by having it pay HUD back with its non-federal funds, or some other pecuniary interest. But the Government proceeded on none of those theories, and instead proceeded on an intangible theory involving nondisclosure of eligibility/non-eligibility based on a conflict of interest. The Court finds this insufficient to support a property wire fraud conviction.

Arguably, the Government's position may have some support under the reasoning in *Shaw v. United States*, 580 U.S. 63, 137 S.Ct. 462, 467 (2016). Notably, in dicta, the Supreme Court reasoned:

> Many years ago Judge Learned Hand pointed out that "[a] man is none the less cheated out of his property, when he is induced to part with it by fraud," even if "he gets a quid pro quo of equal value." *United States v. Rowe*, 56 F.2d 747, 749 (C.A.2 1932). That is because "[i]t may be impossible to measure his loss by the gross scales available to a court,

> but he has suffered a wrong; he has lost," for example, "his chance to
> bargain with the facts before him." *Id*.

*Id*. at 467. But absent a clearer ruling or clearer guidance, this Court does not believe this dicta

overturns precedence. The rule of lenity also favors a reading in favor of Defendant. *See McNally*, 483

U.S. at 359-60 ("When there are two rational readings of a criminal statute, one harsher than the other,

we are to choose the harsher only when Congress has spoken in clear and definite language.").

To be sure, the complexities of some of the legal issues presented here would make a really

interesting appellate or Supreme Court decision. But in light of the binding precedents set forth above,

the Court finds that the Government has failed to sufficiently prove property fraud to allow the 26 wire

fraud convictions to stand. Defendant Smith's motion for judgment of acquittal as to Counts 2 through

27 (wire fraud) is therefore granted.

### B. Conspiracy to Commit Wire Fraud

The parties at the hearing conceded that if Defendant is acquitted of the wire fraud cases, he is

also acquitted as to the conspiracy charge. *See Kelly*, 149 S.Ct. at 1571 n.1 ("If there was property

fraud here, there was also conspiracy to commit it. But if not, not."). Accordingly, the Court also

acquits Defendant as to Count 1 (Conspiracy to Commit Wire Fraud).

### C. Remaining Counts

The remaining counts of conviction are Count 28 (Theft of Government Property); Count 29

(Conspiracy to Commit Money Laundering); Counts 30, 33, and 34 (Engaging in Monetary

Transactions with Proceeds of Specified Unlawful Activity); and Counts 38 and 45 (Laundering of

Monetary Instruments). Because the parties did not fully brief the issue of the effect of an acquittal on

all the underlying wire fraud counts as to remaining counts, the Court will permit additional briefing on this issue. Having concluded that the Government's theory of property fraud is defective as to the wire fraud charges, the question now turns to whether the Government proved a money or property fraud under Section 641's theft of government property, and the money laundering counts. The **Defendant's supplemental brief is due no later than June 22, 2022**; the Government's response is due no later than **July 6, 2022**; and the Defendant's reply is due no later than **July 13, 2022.** (*See* Min., ECF No. 648.) The matter is set for a hearing on July 27, 2022 at 11:00 a.m.[9] With this decision and order now issued setting forth the Court's reasoning for granting in part Defendant's motion for judgment of acquittal, the Court DENIES the Government's unopposed motion for a stay of the briefing schedule. (ECF No. 653.)

## IV.    CONCLUSION

It is unfortunate that this motion presents itself for the first time after a lengthy jury trial and after countless hours expended by both parties, the court, and jurors over the course of five years. But in accordance with the evidence and the law as set forth above, Defendant's motion for judgment of acquittal is GRANTED IN PART. Defendant Smith is acquitted as to Count 1 (Conspiracy to Commit Wire fraud) and Counts 2 through 27 (Wire Fraud).

IT IS SO ORDERED this 3rd day of June, 2022.

_____
RAMONA V. MANGLONA
Designated Judge

---

[9] At this juncture, the Court need not reach Defendant's arguments for a new trial, as well as the arguments pertaining to Count 28's statute of limitations.