SHAWN N. ANDERSON
United States Attorney
MARIVIC P. DAVID
Assistant U.S. Attorney
WILLIAM M. DOOLITTLE
Special Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagåtña, Guam 96910
PHONE: (671) 472-7332
FAX: (671) 472-7334

KENNETH A. POLITE, JR.
Assistant Attorney General
LISA H. MILLER
Deputy Assistant Attorney General
FRANCESCO VALENTINI
Trial Attorney
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
PHONE: (202) 598-2337
FAX: (202) 514-8232

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MARK S. SMITH,<br><br>Defendant. | CRIMINAL CASE NO. 17-00020<br><br>**UNITED STATES' MOTION TO RECONSIDER THE JUNE 3, 2022 ORDER GRANTING JUDGMENTS OF ACQUITTAL AS TO COUNTS 1 THROUGH 27** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 4

ARGUMENT ........................................................................................................................ 7

    I.     Legal Standards ......................................................................................... 7

    II.    The Court Overlooked Evidence That Independently Supports The Jury's Guilty Verdicts On Counts 1 Through 27 ................................................ 9

    III.   The Court Erroneously Concluded That Smith's Misrepresentations Regarding His Conflict Of Interest Do Not Support His Convictions On Counts 1 Through 27 Because The Information "Was Not Of Economic Value" ......................................................................................................... 13

CONCLCUSION .................................................................................................................. 19

i

# TABLE OF AUTHORITIES

**Cases**

*Barber v. Thomas*,
    560 U.S. 474 (2010) ........................................................................................ 19

*Carpenter v. United States*,
    484 U.S. 19 (1987) .......................................................................................... 19

*Jackson v. Virginia*,
    443 U.S. 307 (1979) .......................................................................................... 8

*Kelly v. United States*,
    140 S. Ct. 1565 (2020) ...................................................................................... 5

*Maracich v. Spears*,
    570 U.S. 48 (2013) .......................................................................................... 19

*McDowell v. Calderon*,
    197 F.3d 1253 (9th Cir.1999) ........................................................................... 8

*McNally v. United States*,
    483 U.S. 350 (1987) .......................................................................................... 5

*Shaw v. United States*,
    137 S. Ct. 462 (2016) ...................................................................... 1, 6, 13, 18

*Skilling v. United States*,
    561 U.S. 358 (2010) .......................................................................................... 5

*United States v. Ball*,
    711 Fed. Appx. 838 (9th Cir. 2017) ................................................................ 12

*United States v. Begay*,
    673 F.3d 1038 (9th Cir. 2011) (en banc) ........................................................... 8

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ......................................................................... 1, 18

*United States v. Bruchhausen*,
    977 F.2d 464 (9th Cir. 1992) .................................................................... passim

*United States v. Feathers*,
    No. 14-cr-531, 2017 WL 783947 (N.D. Cal. Mar. 1, 2017) .............................. 8

*United States v. Granberry*,
    908 F.2d 278 (8th Cir. 1990) ....................................................................... 1, 18

*United States v. Harper*,
  32 F.3d 1387 (9th Cir. 1994) ........................................ 17

*United States v. Hector*,
  368 F. Supp. 2d 1060 (C.D. Cal. 2005), *reversed on other grounds*, 474 F.3d 1150 (9th Cir.
  2007) ........................................................................ 7

*United States v. Holden*,
  908 F.3d 395 (9th Cir. 2018) ................................... 3, 10

*United States v. Ibarra*,
  502 U.S. 1 (1991) ...................................................... 2, 7

*United States v. Kelerchian*,
  937 F.3d 895 (7th Cir. 2019) .................................. 1, 18

*United States v. Krug*,
  No. 09-cr-1148, 2013 WL 12216365 (C.D. Cal. Feb. 4, 2013) ........................ 7

*United States v. Lonich*,
  23 F.4th 881 (9th Cir. 2022) ......................................... 12

*United States v. Martin*,
  612 Fed. Appx. 449 (9th Cir. 2015) ......................... 4, 18

*United States v. Martin*,
  796 F.3d 1101 (9th Cir. 2015) ................................ 4, 18

*United States v. Miller*,
  676 F.2d 359 (9th Cir. 1982) ....................................... 12

*United States v. Miller*,
  953 F.3d 1095 (9th Cir. 2020) ................... 6, 10, 13, 14

*United States v. Richter*,
  796 F.3d 1173 (10th Cir. 2015) ............................... 1, 18

*United States v. Riggins*,
  40 F.3d 1055 (9th Cir. 1994) ......................................... 8

*United States v. Rowe*,
  56 F.2d 747 (2d Cir. 1932) .................................. 1, 6, 18

*United States v. Sadler*,
  750 F.3d 585 (6th Cir. 2014) ........................................ 18

*United States v. Smith*,
  No. 17-cr-20, 2021 WL 5261708 (D. Guam Nov. 10, 2021) ........................ 8

*United States v. Viramontes*,
    571 Fed. Appx. 613 (9th Cir. 2014) .............................................................. 12

*United States v. Yates*,
    16 F.4th 256 (9th Cir. 2021) ...................................................................... 5

**Statutes**

18 U.S.C. § 1343 ................................................................................ *passim*

**Other Authorities**

11 Charles Alan Wright et al., Federal Practice and Procedure (3d ed.) ........................................ 8

**INTRODUCTION**

On June 3, 2022, the Court granted defendant Mark S. Smith's post-trial motion for a judgment of acquittal as to Count 1 (Conspiracy to Commit Wire Fraud) and Counts 2 through 27 (Wire Fraud) of the Indictment. ECF No. 656, at 1-2. In the Court's view, "no rational trier of fact could find that all the essential elements of the wire fraud crime w[ere] proven beyond a reasonable doubt" because the government's theory of wire fraud was insufficient as a matter of law. *Id.* at 1. Specifically, this Court concluded that Smith's misrepresentations about his non-compliance with the Housing Assistance Payments ("HAP") contracts' conflict-of-interest requirements did not implicate "a property interest within the ambit of the federal wire fraud statute under Ninth Circuit precedent." *Id.* at 18. The Court reasoned that Smith's false conflict-of-interest certification and related statements, though material, were "not of economic value, as it would not have informed the Government on any decision based on pecuniary interests, but rather one that was merely regulatory." *Ibid.* (emphasis omitted). In so ruling, this Court recognized that several other courts of appeals have rejected Smith's purported distinction between misrepresentations about "economic" matters (which everyone agrees implicate the mail or wire fraud statutes) and misrepresentations about "regulatory" or non-economic matters. *Id.* at 19-21 & n.8 (citing *United States v. Richter*, 796 F.3d 1173, 1191-1192 (10th Cir. 2015), *United States v. Granberry*, 908 F.2d 278, 280-281 (8th Cir. 1990), *United States v. Kelerchian*, 937 F.3d 895, 913-914 (7th Cir. 2019), and *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)). This Court also acknowledged that, in *Shaw v. United States*, 137 S. Ct. 462 (2016), the Supreme Court endorsed Judge Learned Hand's maxim that "'[a] man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'" *Id.* at 467 (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)). But the Court deemed itself "bound" by *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), to draw a distinction

between schemes that misrepresent information of "economic value" and those that misrepresent information that is "regulatory" in nature. ECF No. 656, at 18, 21-22 (emphasis omitted).

Reconsideration is appropriate where, as here, it furnishes a district court "the opportunity to correct [its] own alleged errors" and thereby "prevents unnecessary burdens" on the court of appeals. *United States v. Ibarra*, 502 U.S. 1, 5 (1991) (per curiam). The government moves the Court to reconsider its ruling regarding Counts 1 through 27 on two independent grounds. First, even accepting, *arguendo*, the Court's "economic value" requirement for wire fraud, the Court still erred by considering only a subset of the misrepresentations that Smith and Glenn D. Wong made in furtherance of their scheme to obtain the HAP payments. The Indictment alleged – and overwhelming evidence established at trial – that the defendants' scheme to defraud was not limited to Smith's false certification that he had no conflict of interest that would prevent him from serving as legal counsel for the Guam Housing and Urban Renewal Authority (GHURA) or obtaining HAP funds. The Indictment separately alleged – and the evidence at trial overwhelmingly established – that Smith and Wong also devised a textbook straw purchaser scheme, *i.e.*, that Smith and Wong "misrepresent[ed] to HUD, GHURA, and others their ownership and control of rental properties under the Section 8 Program in order to obtain HAP funds." *E.g.*, ECF No. 1, at 7; *see also* Tr. 3390-93, 3397-98, 3404-05, 3408-13, 3420-23, 3451, 3456, 3483 (summarizing evidence that Smith and Wong misrepresented the true ownership of and control over the rental properties at issue). Those misrepresentations, though *motivated* by Smith's conflict of interest, were fraudulent misrepresentations of fact in their own right. And, importantly, even under the Court's "economic value" paradigm, those misrepresentations, like any straw purchaser scheme, independently deprived the victims, GHURA and HUD, of information of obvious economic value: the identity of the parties with whom GHURA and HUD were really transacting.

1    Any contrary conclusion would strike at the heart of the federal mail and wire statutes by
2    immunizing from criminal liability under those statutes all manner of straw purchaser schemes.
3    Neither *Bruchhausen* nor any other precedent warrants that result. Smith's misrepresentations
4    about the ownership of and control over the rental properties independently support the jury's
5    guilty verdicts as to Counts 1 through 27. For that reason alone, this Court erred in entering
6    judgments of acquittal on those counts.

7        Second, even if the evidence were limited to Smith's misrepresentations about his conflict
8    of interest (as the Court appears to have assumed), the Court still erred in adopting Smith's
9    purported distinction between misrepresentations of "economic value" and misrepresentations that
10   are "regulatory" (or non-pecuniary) in nature. It is well settled – and the jury was instructed in
11   this case – that the federal wire fraud statute prohibits "any scheme or artifice … for obtaining
12   money or property by means of false or fraudulent pretenses, representations, or promises" 18
13   U.S.C. § 1343, so long as the misrepresentations made as part of the scheme are material and made
14   with the requisite intent to defraud. *See*, *e.g.*, *United States v. Holden*, 908 F.3d 395, 399-401 (9th
15   Cir. 2018); ECF No. 557, at 17 (jury instruction for wire fraud). Here, even assuming that the
16   evidence was limited to Smith's misrepresentations about his conflict of interest, the jury had
17   ample basis to find each and every required element of wire fraud. Ample evidence supported the
18   jury's findings that (i) Smith and Wong schemed to obtain the HAP payments; (ii) they did so by
19   means of false representations about, *inter alia*, Smith's lack of conflict of interest; (iii) those
20   misrepresentations were material to GHURA and HUD's decision to pay the HAP funds; and
21   (iv) Smith acted with intent to defraud. The federal wire fraud statute required nothing more.

22       Contrary to the Court's conclusion, *Bruchhausen* does not add an amorphous "economic
23   value" requirement to the type of lies that are actionable under the federal wire fraud statute.
24   *Bruchhausen* involved a customer who lied to sellers about what he planned to do with the products

3

he purchased. *Bruchhausen*, 977 F.2d at 466-468 (false assurances that purchased equipment would be used in the United States). A splintered panel held that such deception did not constitute wire fraud because a seller has no "property" interest "in the disposition of goods it no longer owns." *Id.* at 468. But that holding does not suggest that a scheme like Smith's scheme here, which involved lying to conceal ineligibility for a federal reimbursement program, is nonfraudulent. Indeed, since *Bruchhausen*, the Ninth Circuit has affirmed convictions for wire fraud, where, as here, the defendant's "lies were material to the government's decision to admit her for participation" in a funding program for which she was not qualified, even though the defendant delivered the agreed-upon services. *United States v. Martin*, 612 Fed. Appx. 449, 450 (9th Cir. 2015) (unpublished); *see United States v. Martin*, 796 F.3d 1101, 1103 & n.1 (9th Cir. 2015) (concurrently filed opinion further describing facts).

## BACKGROUND

In March 2011, Smith entered into a contract to serve as GHURA's legal counsel. To obtain the position, however, Smith was required to certify to GHURA that he had no conflict of interest that would prevent him from serving as its legal counsel. Smith could not truthfully make that certification because, at the time, he was receiving landlord HAP funds from GHURA in connection with several rental properties he owned and controlled in Guam. Rather than choosing between becoming GHURA's legal counsel and continuing to receive HAP funds, in March 2011, Smith falsely certified that he had no conflict of interest. Within months, GHURA staff discovered Smith was a Section 8 landlord, and Smith knew he would have to change up the scheme. Starting in November 2011, then, Smith purported to transfer his interests in the rental properties to his confederate, Glenn Wong. He also arranged for the HAP funds to be directed to an account that was facially in Wong's name. In fact, Wong's ownership of and control over the properties was a sham. At all relevant times, Smith remained the true owner – and retained control – of the rental

properties. He was also the de facto recipient of the HAP funds. Smith never divulged the nature of his interests in the properties or in the HAP funds to GHURA, claiming, misleadingly, that he had cleanly transferred the properties to a third party with no conflict of interest. By means of these straw arrangements and misrepresentations, Smith was able to obtain, between March 2012 and May 2014, at least 26 payments of HAP funds from GHURA.

In March 2017, the grand jury charged Smith with numerous offenses, including, as relevant here, conspiracy to commit wire fraud (Count 1) and 26 counts of substantive wire fraud (Counts 2 through 27), with each substantive wire fraud count corresponding to a different wire transfer of HAP funds from GHURA to Wong's sham account. ECF No. 1. After a 24-day trial, a jury found Smith guilty on all counts. ECF No. 561. After trial, Smith moved for judgments of acquittal on all counts (including Counts 1 through 27), asserting, for the first time, that the government's "theory of property fraud was defective." ECF No. 622, at 2. He claimed that the government's theory of property wire fraud was actually an honest services theory in disguise, seemingly for a combination of two reasons: (i) the government's case at trial included evidence about Smith's conflict of interest (the conflict that Smith misrepresented to GHURA and HUD); and (ii) Smith's victims, GHURA and HUD, supposedly did not suffer economic harm (*i.e.*, they neither "paid a premium [n]or received a substandard product," ECF No. 643, at 3). *See generally* ECF No. 622, at 1-11. The government maintained that the evidence presented at trial satisfied all the elements of wire fraud, 18 U.S.C. § 1343, because Smith and Wong schemed to obtain property from GHURA and HUD (*i.e.*, the HAP funds) by means of fraudulent and material misrepresentations. ECF No. 639, at 3-7. It also showed that the conflict-of-interest cases cited by Smith – *McNally v. United States*, 483 U.S. 350 (1987), *Skilling v. United States*, 561 U.S. 358 (2010), *Kelly v. United States*, 140 S. Ct. 1565 (2020), and *United States v. Yates*, 16 F.4th 256, 267 (9th Cir. 2021) – were inapposite because, unlike this case, none involved a scheme whose

object was obtaining, through misrepresentations, funds that the victims would not have otherwise surrendered.  ECF No. 639, at 7-8, 26.

This Court granted Smith's motion in part and entered judgments of acquittal as to Counts 1 through 27.  ECF No. 656.  This Court noted, correctly, that, because the Indictment alleged only a property wire fraud theory, "the Court need not address the issue of whether the Government has proved an honest-services wire fraud."  *Id.* at 16.  The Court also observed that *McNally*, *Kelly*, and *Yates* – the decisions exploring the boundary between property fraud and honest-services fraud cited by Smith – are "distinguishable" because, unlike Smith's scheme to obtain HAP funds, "the charges in those cases did not involve a scheme targeting the victim's money or property" in the first place.  *Ibid.*  The Court further "agree[d] with the Government that there is no loss element in wire fraud."  *Id.* at 15 n.15 (citing *Shaw v. United States*, 137 S. Ct. 462, 467 (2016), and *United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020)).  And the Court acknowledged (*id.* at 19-22) that Smith's misrepresentations of his conflict of interest, without more, would support the jury's guilty verdicts under the precedent of several courts of appeals outside the Ninth Circuit, as well as under the Supreme Court's "dicta," *id.* at 22, in *Shaw* that a "'man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'"  *Shaw*, 137 S. Ct. at 467 (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)); *see* ECF No. 656, at 19-21 (citing precedent from the Second, Seventh, Eighth, and Tenth Circuits).

Nonetheless, the Court deemed itself "bound" by the Ninth Circuit's splintered decision in *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992), to distinguish between schemes involving misrepresentations of facts of "economic value" (which the Court acknowledged are criminal under the federal wire and mail fraud statutes) and schemes involving misrepresentations of information that is "regulatory" (which the Court viewed as beyond the reach of the federal mail

and wire fraud statutes).  ECF No. 656, at 18, 21-22.  Applying that dichotomy here, the Court acknowledged that the Indictment alleged a viable property fraud theory.  *Id.* at 15-16.  But it then stated that "what the Government charged and what the Government proved are two separate matters," and found the latter lacking.  *Id.* at 17.  The Court reasoned that because "full economic value" (*i.e.*, the rental properties) "was given in exchange for the money or property taken" (*i.e.*, the HAP funds), "the core interest that was proven at trial was that HUD and GHURA were really deprived of the *truth* about Smith and Wong's eligibility based on an undisclosed conflict of interest."  *Id.* at 17-18.  Having concluded that the "information that [the victims were] deprived of was not of economic value, as it would not have informed the Government on any decision based on pecuniary interests, but rather one that was merely regulatory," the Court found the trial evidence insufficient to support Smith's convictions under *Bruchhausen*, 977 F.2d at 468.  ECF No. 656, at 18 (emphasis omitted).

## ARGUMENT

### I. Legal Standards

A reconsideration motion gives district courts "the opportunity to correct their own alleged errors," which in turn "prevents unnecessary burdens being placed on the courts of appeals." *United States v. Ibarra*, 502 U.S. 1, 5 (1991) (per curiam).  Although not provided for under the Federal Rules of Criminal Procedure, "numerous circuit courts have held that motions for reconsideration may be filed in criminal cases."  *United States v. Krug*, No. 09-cr-1148, 2013 WL 12216365, at *2 (C.D. Cal. Feb. 4, 2013) (unpublished) (quoting *United States v. Hector*, 368 F. Supp. 2d 1060, 1063 (C.D. Cal. 2005), *reversed on other grounds*, 474 F.3d 1150 (9th Cir. 2007)).

"'Motions for reconsideration in criminal cases are governed by the rules that govern equivalent motions in civil proceedings,' which are the standards under Federal Rules of Civil Procedure 59(e) and 60(b)."  *United States v. Smith*, No. 17-cr-20, 2021 WL 5261708, at *2 (D.

Guam Nov. 10, 2021) (quoting *United States v. Feathers*, No. 14-cr-531, 2017 WL 783947, at *2 (N.D. Cal. Mar. 1, 2017)) (brackets and additional quotation marks omitted).  Rule 59(e) of the Federal Rules of Civil Procedure, in particular, authorizes motions to alter or amend a judgment. Such motions "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to entry of judgment," 11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (3d ed.) (footnotes omitted), but a "district court enjoys considerable discretion in granting or denying" a Rule 59(e) motion.  *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999).  A Rule 59(e) motion may be granted on any of four grounds: (1) a manifest error of law or fact upon which the judgment is based; (2) newly discovered or previously unavailable evidence; (3) manifest injustice; and (4) an intervening change in controlling law.  *McDowell*, 197 F.3d at 1255 n. 1.

Because the government seeks reconsideration of an order granting post-trial judgments of acquittal, Federal Rule of Criminal Procedure 29 supplies the underlying substantive legal standards.  A Rule 29 motion should be denied if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).  Given these standards, "a jury's verdict is not to be disturbed lightly."  *United States v. Begay*, 673 F.3d 1038, 1043 (9th Cir. 2011) (en banc).

Reconsideration of this Court's June 3, 2022 sufficiency-of-the-evidence ruling is warranted for two reasons: first, the Court did not consider additional evidence, presented at trial, that independently supports the jury's guilty verdicts on Counts 1 through 27; and second, by adopting Smith's "economic value" theory of wire fraud, this Court made a manifest error of law.

## II. The Court Overlooked Evidence That Independently Supports The Jury's Guilty Verdicts On Counts 1 Through 27

Even accepting the Court's "economic value" requirement for property wire fraud (*but see infra* Part III), the Court erred in granting judgments of acquittal on Counts 1 through 27 because its analysis focused singularly on Smith's false certifications and representations about his conflict of interest. Whatever may be said of those misrepresentations, Smith and Wong's scheme also included misrepresentations that went to the core *economic* bargain between the parties: Smith and Wong misrepresented to GHURA the identity of the owner of the rental properties and of the party in actual control of those rental properties. Those misrepresentations, in their own right, made the scheme in this case a textbook straw purchaser scheme – in the core of the wire fraud property statute. Even under this Court's reading of *Bruchhausen* and the wire fraud statute, they supplied sufficient evidence to support the jury's guilty verdicts on Counts 1 through 27.

A. Section 1343 of Title 18 makes it a crime for anyone:

> having devised or intending to devise any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises*, [to] transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

(Emphasis added). Consistent with the statute, this Court instructed the jury that the government was required to establish four elements:

> First, the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts … [;]
>
> Second, the statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;
>
> Third, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

9

Fourth, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

ECF No. 557, at 17 (jury instruction no. 16); *see, e.g.*, *United States v. Holden*, 908 F.3d 395, 399-401 (9th Cir. 2018); *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020).

B.     In granting Smith's motions for judgments of acquittal, this Court appears to have focused exclusively on one set of misrepresentations that were part of Smith's scheme: Smith's misrepresentations about his eligibility for the HAP program. *See, e.g.*, ECF No. 656, at 17-18 (addressing allegations that "what made the conduct suddenly unlawful was when he became GHURA's counsel and became subject to the conflict-of-interest provisions"), *id.* at 18-19 (explaining that, by showing that Smith misrepresented his compliance with conflict-of-interest requirements, "the Government might have proved a breach of contract claim," but "it did not prove a wire fraud case").   In other words, the Court concluded that, because all Smith misrepresented was his "regulatory" compliance with certain program requirements, he did not commit wire fraud, at least under the Court's reading of *Bruchhausen*.

Contrary to the Court's apparent premise, the government's case against Smith was not so limited.  The Indictment did not merely allege that Smith misrepresented his regulatory compliance with conflict-of-interest regulations.  It also alleged that Smith and Wong devised a textbook straw purchaser scheme – *i.e.*, that Smith and Wong "misrepresent[ed] to HUD, GHURA, and others their ownership and control of rental properties under the Section 8 Program in order to obtain HAP funds." *E.g.*, ECF No. 1, at 7; *see ibid.* (alleging that Smith and Wong "made and caused to be made material misrepresentations and omissions to GHURA, HUD, and others regarding their ownership and control of rental properties"), *id.* at 8-9 (alleging that, in November 2011, Smith executed a sham quitclaim deed for the rental properties, while retaining de facto ownership and

control), *id.* at 11 (alleging that, when the rental properties were ultimately sold in October 2014, Wong turned over the proceeds in full to Smith).

Likewise, the evidence presented at trial amply established that Smith and Wong devised and executed a classic straw purchaser scheme. The evidence showed that Smith purported to transfer title to the rental properties to Wong in exchange for nominal consideration, but that Smith retained de facto ownership of and control over those properties. *See* Government's Exhibits 1-9, 41-42, 131b, 178-181, 184-188, 191-193, 195, 197-210, 220-230; Tr. 3425, 3432, 3460-61. The evidence also showed that Smith and Wong knowingly misrepresented the true ownership of and control over the rental properties to GHURA and HUD, for the purpose of obtaining the corresponding HAP funds. *See* Government's Exhibits 26d, 26e, 26f, 26g, 26h, 41, 46, 131b; Tr. 3402-3412. And the evidence showed that Smith's and Wong's lies about the true ownership of the rental properties were material – *i.e.*, that they had a natural tendency to influence GHURA's decision to part with the HAP funds. In short, Smith's and Wong's straw purchaser misrepresentations satisfied – in their own right and independently of Smith's false certifications and statements about his conflict of interest – each and every element of property wire fraud for the 26 payments charged in the Indictment.[1] They also established that Smith and Wong engaged in a conspiracy to commit wire fraud, as charged in Count 1. Those misrepresentations accordingly independently supported the jury's guilty verdicts on Counts 1 through 27.

Nor does the Court's "economic value" rationale – which underpins the Court's June 3 order – cast doubt on the criminality of the straw purchaser component of the defendants' scheme. Whatever the merit of an "economic value" requirement carving out "regulatory"

---

[1] The HAP payments underlying Counts 2 through 27 were executed between March 16, 2012, and May 2, 2014 – *i.e.*, after Smith's sham transfer of the rental properties to Wong in November and December 2011. *See* ECF No. 1, at 8-9, 11, 14.

misrepresentations (*but see infra* Part III), that carveout cannot plausibly extend to textbook straw purchaser fraud schemes such as this one. Straw purchaser schemes by definition deprive victims of a quintessentially *economic* part of their bargain: the fact that the victim is buying a service from (or extending a loan to, or whatever) a particular economic agent, with all the economic risk and calculus that accompanies the victim's acceptance of that particular (sham) actor as its business counterpart. For that reason alone, straw purchaser schemes necessarily satisfy this Court's "economic value" requirement.[2]

In other words, extending the Court's "economic value" requirement to immunize run-of-the-mill straw purchaser schemes would be a grave error, as a matter of both law and, if the theory took root, real-world consequences as well. The Ninth Circuit has repeatedly affirmed convictions under the federal wire, mail, and bank fraud statutes based on straw purchaser schemes that, like Smith's, obfuscated the identity of a victim's counterpart for the purpose of inducing a business transaction. *See*, *e.g.*, *United States v. Miller*, 676 F.2d 359, 362 (9th Cir. 1982) (affirming mail fraud convictions based on participation in straw purchaser scheme to obtain mortgages); *United States v. Lonich*, 23 F.4th 881, 890, 901 (9th Cir. 2022) (affirming bank and wire fraud convictions based on participation in straw purchaser scheme to obscure true identity of purchaser in an FDIC auction and in various mortgage applications); *United States v. Viramontes*, 571 Fed. Appx. 613, 615 (9th Cir. 2014) (unpublished) (affirming bank fraud conviction based on participation in straw purchaser scheme); *United States v. Ball*, 711 Fed. Appx. 838, 842-843 (9th Cir. 2017) (unpublished) (affirming wire fraud conviction based on participation in straw purchaser scheme to seize control of homeowner associations). Nothing in *Bruchhausen* warrants a contrary result

---

[2]     The government was, of course, still required to establish the remaining elements of wire fraud, including materiality. Smith, however, did not challenge the sufficiency of the evidence as to those elements, which were amply established at trial.

in this case.  Indeed, a contrary result, if it ever became precedential, would effectively immunize from the federal fraud statutes a wide array of lies about the true identity of business actors.  That outcome, in turn, would have unpredictable and potentially severe consequences for the government's ability to protect the integrity of interstate commerce.

**III.    The Court Erroneously Concluded That Smith's Misrepresentations Regarding His Conflict Of Interest Do Not Support His Convictions On Counts 1 Through 27 Because The Information "Was Not Of Economic Value"**

More fundamentally, reconsideration of the Court's June 3 order is appropriate because the Court's imposition of an atextual "economic value" requirement for property wire fraud constitutes clear legal error, which resulted in manifest injustice: the erroneous entry of post-trial judgments of acquittal on 27 counts, after a properly instructed jury found Smith guilty on each of those counts.

A.    As noted, the wire-fraud statute prohibits using an interstate wire communication in furtherance of "any scheme or artifice to defraud, *or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises*." 18 U.S.C. § 1343 (emphasis added).  In its June 3 order, moreover, this Court correctly accepted two legal principles relevant here.  First, the Court "agree[d] with the Government that there is no loss element in wire fraud." ECF No. 656, at 15 n.5 (citing *Shaw v. United States*, 137 S. Ct. 462, 467 (2016), and *Miller*, 953 F.3d at 1103); *accord* ECF No. 639, at 4-5 (government's explanation that "the fraud statutes proscribe schemes for 'obtaining money or property' through deceit" and "do not additionally require a 'financial loss' or 'intended financial loss' by the victim," citing cases).  Second, this Court recognized that *McNally*, *Kelly*, and *Yates* – the decisions cited by Smith for his view that this case is an honest-services case in disguise – are "distinguishable" in the sense that "the charges

in those cases did not involve a scheme targeting the victim's money or property" in the first place. ECF No. 656, at 16. Here, in contrast, Smith and Wong schemed to obtain HAP funds.

Under these standards, the trial evidence, even when (incorrectly) limited to Smith's misrepresentations about his conflict of interest, easily supported the jury's guilty verdicts on Counts 1 through 27. Smith and Wong plainly (i) schemed to "obtain" GHURA's and HUD's "money or property"; (ii) "by means of false or fraudulent … representations" about Smith's eligibility; (iii) that were material to GHURA's and HUD's decision to part with the HAP funds; and (iv) Smith and Wong acted with the intent to defraud – *i.e.*, "to deprive the victim of money or property" (again, the HAP funds) "by means of [the] deception," *Miller*, 953 F.3d at 1103. Section 1343 required nothing more.

B.     Despite appearing to concur with much of this analysis, this Court deemed itself "bound" (ECF No. 656, at 21) to acquit Smith on Counts 1 through 27 on account of the Ninth Circuit's decision in *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992). The Court's reading and application of *Bruchhausen* are, however, legally flawed.

1.     In *Bruchhausen*, the defendant arranged to give false assurances to various manufacturers of American high-technology products that the equipment he purchased from them would be used domestically. 977 F.2d at 466-468. In fact, Bruchhausen was arranging to have the equipment smuggled to Soviet Bloc countries. *Ibid.* After law enforcement learned of Bruchhausen's lies, a grand jury charged him with, among other charges, violating the federal wire fraud statute, 18 U.S.C. § 1343. Specifically, the indictment charged him with "'defraud[ing] [the] manufacturers … of their property and their right to make business decisions based on truthful information and representations.'" 977 F.2d at 467.

A splintered panel of the Ninth Circuit found the indictment legally insufficient. Two judges (Canby and Kozinski, JJ.) reasoned that "the manufacturers were [not] defrauded of

'property' within the meaning of the statute" for a combination of two reasons. 977 F.3d at 467. First, "[t]he manufacturers received the full sale price for their products." *Ibid*. Or, to put the same point differently, they "suffered no monetary loss." *Ibid*. Second, "[w]hile [the manufacturers] may have been deceived into entering sales that they had the right to refuse, their actual loss was in control over the destination of their products after sale." *Ibid*. And, on that score, the two-judge majority found "[i]t … difficult to discern why they had a property right to such post-sale control." *Ibid*.

Judge Fernandez concurred in the result, in an opinion that Judge Kozinski also joined. *See Bruchhausen*, 977 F.2d at 469 (Fernandez, J., concurring); *ibid.* (Kozinski, J., concurring) ("Because the majority opinion and Judge Fernandez's concurrence are entirely consistent, and each interprets the applicable law correctly, I join both."). Judge Fernandez agreed that "the right of manufacturers to make decisions based on truthful information is far too ethereal to be a property right for the purposes of the wire fraud statute." *Ibid*. But he parted ways with the majority's suggestion that "a person has not been defrauded of his property when he is induced by fraudulent representations to transfer that property to another." *Ibid*. Judge Fernandez reasoned that "at the very least ownership of a tangible object … includes the right to retain that object and to refuse to transfer it to others." *Ibid*. Therefore, "[w]hen a prospective buyer lies in order to evade those strictures, a fraud has been committed upon the owner of the item just as surely as if the buyer had issued a rubber check." *Ibid.*; *see also ibid.* ("[A] person can fraudulently deprive another of property even when willing to pay fair market value."). On the facts presented, Judge Fernandez concluded that, "[w]hen Bruchhausen lied in order to evade [the manufacturers'] condition [on their sale], he did commit a fraud." *Ibid.*

The Court in this case found the *Bruchhausen* majority opinion dispositive. It found that, similarly to *Bruchhausen*, (i) "full economic value" (*i.e.*, the rental properties) "was given in

exchange for the money or property taken" (*i.e.*, the HAP funds); and (ii) GHURA's interest in "the *truth* about Smith and Wong's eligibility based on an undisclosed conflict of interest" was not cognizable under the federal fraud statute because it "was not of *economic* value, as it would not have informed the Government on any decision based on pecuniary interests, but rather one that was merely regulatory." ECF No. 656, at 17-18.

2. This Court's heavy reliance on the *Bruchhausen* majority opinion is misplaced. The *Bruchhausen* majority's holding is narrow. The majority held merely that, in the context of sales of tangible goods, a purchaser's false assurances about his intended use of the goods do not constitute property wire fraud because a seller has no "property" interest in "the disposition of goods it no longer owns." 977 F.2d at 468; *see also ibid.* ("We conclude … that the interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law is not 'property' of the kind that Congress intended to reach in the wire fraud statute."). That narrow holding – right or wrong – is limited to one particular context (*i.e.*, the sale of tangible goods) and one type of misrepresentation (*i.e.*, misrepresentations of the purchaser's intended post-sale use of the goods). It does not support the sweeping proposition adopted by the Court in this case: that, in all cases, the federal property wire and mail fraud statutes protect only against misrepresentations "of economic value" – that is, misrepresentations that "would … have informed the [victim] on a[] decision based on pecuniary interests." ECF No. 656, at 18 (emphasis omitted). Or, to put the same point differently, the *Bruchhausen* majority did not immunize misrepresentations that go to the essential aspects of the parties' bargain, but happen to be non-pecuniary in nature. The *Bruchhausen* majority endorsed the far narrower proposition that, in a sale of tangible goods, if a purchaser pays fair market value, his false assurances about the goods' future use are not, in the mine run of cases, an essential aspect of the parties' bargain.

The Court's sweeping reading of *Bruchhausen*, in contrast, is incorrect for at least two reasons. The first reason is found within the four corners of the *Bruchhausen* opinions. Judge Kozinski, who provided the decisive second vote in *Bruchhausen*, expressly joined both the majority and Judge Fernandez's concurrence because he found that the two were "entirely consistent" and both "interpret[ed] the applicable law correctly." 977 F.2d at 469. But Judge Fernandez's concurrence squarely rejected any broad proposition that, so long as a victim receives "a monetary payment equal to the fair market value of the property," he "has not been defrauded of his property," even though "he is induced by fraudulent representations to transfer that property" in the first place. *Ibid.*; *see also ibid.* ("[A] person can fraudulently deprive another of property even when willing to pay fair market value."). That Judge Kozinski joined both the majority and Judge Fernandez's concurrence – and that he found the two "entirely consistent," *ibid.* – necessarily means that the majority's holding was narrower. It means that the majority's holding was limited to the *sui generis* type of forward-looking statements that were at issue in *Bruchhausen*: promises about the purchaser's future "disposition of goods" once the seller no longer owned the goods. *Id.* at 468.

Second, but equally important, the Court's broad interpretation of the *Bruchhausen* majority is irreconcilable with subsequent Ninth Circuit precedent. It is irreconcilable with the Ninth Circuit's own later statement adopting, in a unanimous and precedential opinion, *Judge Fernandez*'s take of general principles of property wire fraud: "'The strictures an owner puts on his willingness to sell an item are not mere ephemera. When a prospective buyer lies in order to evade those strictures, a fraud has been committed upon the owner of the item." *United States v. Harper*, 32 F.3d 1387, 1389 (9th Cir. 1994) (quoting *Bruchhausen*, 977 F.2d at 469 (Fernandez, J., concurring, joined by Kozinski, J.)). It is also irreconcilable with the Ninth Circuit's subsequent affirmance of wire fraud convictions where the defendant's non-pecuniary "lies were material to

the government's decision to admit her for participation" in a funding program for which she was not qualified.  *See, e.g.*, *United States v. Martin*, 612 Fed. Appx. 449, 450 (9th Cir. 2015) (unpublished); *see United States v. Martin*, 796 F.3d 1101, 1103 & n.1 (9th Cir. 2015) (concurrently filed opinion further describing facts).  Finally, by effectively requiring a showing of monetary loss by the victim (to show that the defendant's misrepresentation is of "economic value"), the Court's sweeping reading of *Bruchhausen* necessarily nullifies a key principle of property wire fraud that the Court itself accepts elsewhere in its order: that "there is no loss element in wire fraud."  ECF No. 656, at 15 & n.5 (citing cases).

Not surprisingly, no court of appeals, much less the Ninth Circuit, appears to have extended the *Bruchhausen* majority's holding beyond the limited context in which it arose.[3]  On the other hand, as this Court has observed, several courts of appeals have expressly adopted the government's view that any factual misrepresentation, so long as it is material to the victim's decision to part with her property, can support a conviction for property wire fraud.  *See* ECF No. 656, at 19-21 & n.8 (discussing *United States v. Richter*, 796 F.3d 1173, 1191-1192 (10th Cir. 2015), *United States v. Granberry*, 908 F.2d 278, 280-281 (8th Cir. 1990), *United States v. Kelerchian*, 937 F.3d 895, 913-914 (7th Cir. 2019), and *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015)).  And the Supreme Court strongly suggested the same view in *Shaw* when it quoted with approval Judge Learned Hand's maxim that "'a man is none the less cheated out of his property, when he is induced to part with it by fraud,' even if 'he gets a quid pro quo of equal value.'"  137 S. Ct. at 467 (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)); *se*

---

[3]    This Court's June 3 order references (ECF No. 656, at 19) the Sixth Circuit's decision in *United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014).  But that decision, too, involved only a purchaser's false assurances about what she planned to do with the products she purchased – in that case, who would receive the opiates that the defendant purchased from pharmaceutical distributors.  *Id.* at 590.

*also id.* ("[W]hen interpreting the analogous mail fraud statute, we have held it 'sufficient' that the victim (here, the bank) be 'deprived of its right' to use of the property, even if it ultimately did not suffer unreimbursed loss.") (quoting *Carpenter v. United States*, 484 U.S. 19, 26-27 (1987)). Neither *Bruchhausen* nor principles of lenity[4] support this Court's contrary conclusion.

## CONCLCUSION

For these reasons, the Court should grant the government's motion for reconsideration of the Court's June 3, 2022 order and deny Smith's motion for judgments of acquittal as to Counts 1 through 27.

RESPECTFULLY SUBMITTED this 29th day of June, 2022.

SHAWN N. ANDERSON                            KENNETH A. POLITE, JR.

United States Attorney                        Assistant Attorney General
Districts of Guam and the NMI                 Criminal Division
                                              U.S. Department of Justice

By:  /s/ William M. Doolittle            By:  /s/ Francesco Valentini
     WILLIAM M. DOOLITTLE                      FRANCESCO VALENTINI
     Special Assistant U.S. Attorney           Trial Attorney

By:  /s/ Marivic P. David
     MARIVIC P. DAVID
     Assistant U.S. Attorney

---

[4] This Court stated that "[t]he rule of lenity also favors" Smith's reading. ECF No. 656, at 22. But the Supreme Court has made clear that the rule applies only if, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)). Here, neither the text of 18 U.S.C. § 1343 nor any applicable rule of statutory construction supports the imposition of an atextual "economic value" limitation on the type of misrepresentations actionable under the federal property wire fraud statute. Accordingly, no ambiguity exists in this case, and lenity should play no role.